ORAL ARGUMENT SCHEDULED FOR MAY 7, 2019
CASE NO. 18-1202

In the

# UNITED STATES COURT OF APPEALS
### FOR THE DISTRICT OF COLUMBIA CIRCUIT

PRODUCERS OF RENEWABLES UNITED FOR
INTEGRITY TRUTH AND TRANSPARENCY,

*Petitioner,*

v.

ENVIRONMENTAL PROTECTION AGENCY,

*Respondent.*

ON PETITION FOR REVIEW FROM THE UNITED STATES
ENVIRONMENTAL PROTECTION AGENCY

## FINAL OPENING BRIEF OF PETITIONER

Sandra P. Franco
Franco Environmental Law LLC
600 Pennsylvania Ave., SE
Unit 15577
Washington, DC 20003

Jerome C. Muys, Jr.
Muys & Associates, LLC
910 17th Street, NW
Suite 800
Washington, DC 20006
T 202 559-2054
F 202 559-2052
jmuys@muyslaw.com

*Counsel for Producers of Renewables
United for Integrity Truth and
Transparency*

**Dated:** **April 1, 2019**

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to Circuit Rule 28(a)(1), Petitioner provides the following list of parties to this case, rulings under review, and related cases:

1.    Parties and Amici

This case is a petition for review of final agency action by the U.S. Environmental Protection Agency (EPA). There was no action in the district court, and so there were no parties in the district court. The parties in this Court in this petition for review are:

> Petitioner:  Producers of Renewables United for Integrity Truth and Transparency
>
> Respondent:  EPA
>
> Respondent-Intervenors:  HollyFrontier Refining & Marketing LLC, HollyFrontier Cheyenne Refining LLC, Sinclair Wyoming Refining Company, and Sinclair Casper Refining Company

2.    Rulings Under Review

a)    Petitioner seeks review of EPA's determination to allow the generation or reinstatement of Renewable Identification Numbers (RINs) under the Renewable Fuel Standard (RFS) program by small refineries that represent previously retired or expired RINs, including generation of current-year RINs by refineries that did not produce biofuel, referred to as the "Small Refinery RINs."  During the course of this case, EPA identified five documents that included this decision:

- Grant of Request for Extension of Small Refinery Temporary Exemption Under the Renewable Fuel Standards Program for Sinclair Casper Refining Company's Sinclair Casper Refinery, Dec. 20, 2017;

- Grant of Request for Extension of Small Refinery Temporary Exemption Under the Renewable Fuel Standards Program for Sinclair Casper Refining Company's Sinclair Casper Refinery, Dec. 21, 2017;

- Grant of Request for Extension of Small Refinery Temporary Exemption Under the Renewable Fuel Standards Program for Sinclair Wyoming Refining Company's Sinclair Wyoming Refinery, Dec. 20, 2017;

- Grant of Request for Extension of Small Refinery Temporary Exemption Under the Renewable Fuel Standards Program for Sinclair Wyoming Refining Company's Sinclair Wyoming Refinery, Dec. 21, 2017; and

- Grant of Request for Extension of Small Refinery Temporary Exemption Under the Renewable Fuel Standards Program for HollyFrontier Cheyenne Refining LLC's Cheyenne, WY Refinery, Jan. 24, 2018

(referred to collectively as "Small Refinery RIN Decisions"). None of these decisions was published in the Federal Register, but EPA made a statement regarding this determination, which was reported to the public in a June 1, 2018 article entitled "EPA's Grant of 2018 RIN Credits to Two Refiners Riles Biofuels Industry," by Dan Macy, OPIS.

Small Refinery RINs result from EPA's determination that it can grant small refinery exemptions after the compliance demonstration deadline, which was reflected in a July 12, 2018 letter from EPA to Senator Grassley. Without public notice and comment, EPA determined that, in such cases, it could "un-retire" previously retired RINs. The July 12, 2018 letter also noted an increase in

exemptions granted for compliance years 2016 and 2017, including an increase in the number of retroactively granted exemptions.

b)      The EPA actions noted in paragraph (2)(a) above, which were not previously known to the public, raise new grounds for objecting to EPA's promulgation of 40 C.F.R. §80.1441. Section 80.1441 outlines the process for seeking small refinery exemptions under 42 U.S.C. §7545(o)(9) and was promulgated in "Regulation of Fuels and Fuel Additives: Changes to Renewable Fuel Standard Program," published at 75 Fed. Reg. 14,670 (Mar. 26, 2010), and amended in 79 Fed. Reg. 42,128, 42,163 (July 18, 2014). Although EPA did not explain its determination that it can receive and grant exemptions after the compliance demonstration deadlines to the public or its determination that it can "un-retire" RINs, the new information revealed regarding EPA's implementation of the small refinery exemptions also raise new grounds for EPA's prior statements that it may grant exemptions to small refineries after it sets the annual standards without adjusting those standards to account for those exemptions, reflected in "Regulation of Fuels and Fuel Additives: 2012 Renewable Fuel Standards," 77 Fed. Reg. 1320 (Jan. 9, 2012).

These actions also raise new grounds for objecting to the final volumes used by EPA to set the annual standards used by obligated parties to determine their RFS renewable volume obligations through the following final agency actions:

C-3

(a) Renewable Fuel Standard Program: Standards for 2014, 2015, and 2016 and Biomass-Based Diesel Volume for 2017, 80 Fed. Reg. 77,420 (Dec. 14, 2015); (b) Renewable Fuel Standard Program: Standards for 2017 and Biomass-Based Diesel Volume for 2018, 81 Fed. Reg. 89,746 (Dec. 12, 2016); and (c) Renewable Fuel Standard Program: Standards for 2018 and Biomass-Based Diesel Volume for 2019, 82 Fed. Reg. 58,486 (Dec. 12, 2017).

3.    Related Cases

Petitioner is not aware of any pending cases challenging the Small Refinery RINs determination in the Small Refinery RINs Decisions.

The following cases involve the same underlying decisions listed under Paragraph (2)(b) above:

a)    "Regulation of Fuels and Fuel Additives: Changes to Renewable Fuel Standard Program," published at 75 Fed. Reg. 14,670 (Mar. 26, 2010)

   i)    *Nat'l Petrochemical & Refiners Ass'n v. EPA*, 630 F.3d 145 (D.C. Cir. 2010), *reh'g en banc denied*, 643 F.3d 958 (D.C. Cir. 2011), *cert. denied*, 132 S. Ct. 571 (2011)

   ii)   *Nat'l Chicken Council v. EPA*, 687 F.3d 393 (D.C. Cir. 2012)

   iii)  *Nat'l Biodiesel Bd. v. EPA*, 843 F.3d 1010 (D.C. Cir. 2016)

   iv)   *Alon Refining Krotz Springs v. EPA*, Case No. 16-1052 (and consolidated cases) (D.C. Cir. docketed Feb. 12, 2016)

   v)    *Renewable Fuels Association v. EPA*, No. 18-1154 (D.C. Cir. docketed June 4, 2018)

b)    Regulation of Fuels and Fuel Additives: 2012 Renewable Fuel Standards, 77 Fed. Reg. 1320 (Jan. 9, 2012):  *American Petroleum Inst. v. EPA*, 706 F.3d 474 (D.C. Cir. 2013)

c)    Renewable Fuel Standard Program: Standards for 2014, 2015, and 2016 and Biomass-Based Diesel Volume for 2017, 80 Fed. Reg. 77,420 (Dec. 14, 2015):

    i)    *Americans for Clean Energy v. EPA*, 864 F.3d 691 (D.C. Cir. 2017)

    ii)    *Alon Refining Krotz Springs v. EPA*, Case No. 16-1052 (and consolidated cases) (D.C. Cir.)

d)    Renewable Fuel Standard Program: Standards for 2017 and Biomass-Based Diesel Volume for 2018, 81 Fed. Reg. 89,746 (Dec. 12, 2016): *Coffeyville Resources Refining & Marketing, LLC v. EPA*, No. 17-1044 (and consolidated cases) (D.C. Cir.)

e)    Renewable Fuel Standard Program: Standards for 2018 and Biomass-Based Diesel Volume for 2019, 82 Fed. Reg. 58,486 (Dec. 12, 2017): *American Fuel & Petrochemical Manufacturers v. EPA*, No. 17-1258 (and consolidated cases) (D.C. Cir.).

Petitions that have been voluntarily dismissed may not be listed separately.

The issues raised in these cases are distinct from the issues raised in this case, except that the National Biodiesel Board has asserted that EPA failed to adequately account for the small refinery exemptions with respect to the 2018 Renewable Fuel Standards in *American Fuel & Petrochemical Manufacturers v. EPA*, No. 17-1258 (and consolidated cases).

Two other cases have been filed that seek to challenge certain of the underlying small refinery exemptions that have been granted by EPA and remain

pending: *American Biofuels Association v. EPA*, No. 18-1115 (D.C. Cir.) and

*Renewable Fuels Association v. EPA*, No. 18-9533 (10th Cir.).

## RULE 26.1 CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and D.C. Circuit Rule 26.1, Producers of Renewables United for Integrity Truth and Transparency (Petitioner) makes the following disclosure:

Petitioner has no parent companies, and no publicly-held company has a 10% or greater ownership interest. It has not issued shares or debt securities to the public.

Petitioner is an ad hoc working group of companies that own and operate biomass-based diesel and ethanol production plants and participate in the Renewable Fuel Standard (RFS) program. Through those operations, they also own Renewable Identification Numbers (RINs). These companies have joined together to form a working group to raise concerns with EPA's recent handling of the small refinery exemptions, which has adversely affected RINs and the operation of the RFS program, and advocate for changes in EPA's handling of these exemptions.

None of the members of the working group have issued shares or debt securities to the public, except Renewable Energy Group, Inc.

# TABLE OF CONTENTS

**Page**

CERTIFICATE AS TO PARTIES, RULINGS UNDER REVIEW AND
    RELATED CASES ................................................................................C-1

CORPORATE DISCLOSURE STATEMENT ...................................................C-7

TABLE OF AUTHORITIES ...........................................................................iv

GLOSSARY OF ACRONYMS AND ABBREVIATIONS................................. xiii

JURISDICTIONAL STATEMENT ....................................................................1

STATEMENT OF ISSUES .................................................................................3

STATUTES AND REGULATIONS ....................................................................5

STATEMENT OF THE CASE ............................................................................5

STATEMENT OF FACTS ..................................................................................6

    A.    The RFS Program........................................................................6

    B.    Small Refinery Exemptions .......................................................8

    C.    EPA's Recent Handling of Small Refinery Exemptions .........13

SUMMARY OF ARGUMENT .........................................................................16

STANDING ....................................................................................................17

ARGUMENT ..................................................................................................19

    I.    STANDARD OF REVIEW ............................................................19

## TABLE OF CONTENTS
### (cont.)

                                                                                    **Page**

II.   EPA's Allowance of Small Refinery RINs Violates the
      Statute and EPA's Own Regulations and is Arbitrary ..........20

      A.   EPA Was Required to Undergo Rulemaking to Allow
           Generation of RINs by Small Refineries ................................20

      B.   The Statute Does Not Authorize Generation of RINs by
           Small Refineries that Obtain an Exemption, Even if Late.......26

      C.   Even if There Was a Gap in the Statute, Allowing Small
           Refinery RINs is Arbitrary........................................................30

      D.   The D.C. Circuit is the Appropriate Venue Here ....................33

III.  EPA's Determination to Allow Retroactive Grants of
      Exemptions and EPA's Failure to Account for Lost
      Volumes as a Result Are Against the Law and Arbitrary .....37

      A.   This Court has Jurisdiction to Hear Petitioner's Grounds
           Arising After Claims................................................................39

           1.   EPA's expansion of its authority through secret
                adjudications are new and unexpected
                modifications to EPA regulations...................................40

           2.   Petitioner's claims only now ripened ...........................41

           3.   EPA reopened prior determinations ..............................44

           4.   This Court may proceed to the merits without
                waiting for EPA action on Petitioner's petition for
                reconsideration...............................................................47

      B.   Retroactive Exemptions are Not Consistent with Law............49

      C.   If §80.1441 Allows for Retroactive Exemptions, it is
           Arbitrary...................................................................................51

## TABLE OF CONTENTS
### (cont.)

|  |  | **Page** |
|---|---|---|
| D. | EPA Must Reassess the 2016, 2017 and 2018 Standards Because it has Not Ensured the Required Volumes | 55 |

CONCLUSION ................................................................................55

CERTIFICATION PURSUANT TO FRAP 32(A)(7) ..........................................57

CERTIFICATE OF SERVICE

ADDENDUM

    Cain Declaration

    Statutory Addendum

# TABLE OF AUTHORITIES

Page(s)

## FEDERAL CASES

*Air Alliance Houston v. EPA*,
   906 F.3d 1049 (D.C. Cir. 2018)..........................................................20, 51, 53

*Alaska Dep't of Envtl. Conservation v. EPA*,
   540 U.S. 461 (2004)...........................................................................19

*Am. Med. Ass'n v. Reno*,
   57 F.3d 1129 (D.C. Cir. 1995)...............................................................40

*Am. Petroleum Inst. v. Costle*,
   665 F.2d 1176 (D.C. Cir. 1981)..............................................................48

*Am. Petroleum Inst. v. EPA*,
   706 F.3d 474 (D.C. Cir. 2013)...............................................................46

*Am. Radio Relay League, Inc. v. FCC*,
   524 F.3d 227 (D.C. Cir. 2008)...............................................................24

*\*Ams. for Clean Energy v. EPA*,
   864 F.3d 691 (D.C. Cir. 2017)................................................6, 25, 28, 53

*Ass'n of Am. Railroads v. I.C.C.*,
   846 F.2d 1465 (D.C. Cir. 1988).............................................................42

*ATK Launch Sys., Inc. v. EPA*,
   651 F.3d 1194 (10th Cir. 2011) ............................................................36

*City of Idaho Falls, Idaho v. FERC*,
   629 F.3d 222 (D.C. Cir. 2011)...............................................................23

*Clean Air Council v. Pruitt*,
   862 F.3d 1 (D.C. Cir. 2017)..................................................................23

*\*Coalition for Responsible Regulation, Inc. v. EPA*
   684 F.3d 102 (D.C. Cir. 2012), *aff'd in part, rev'd in part sub nom.*
   *Util. Air Regulatory Grp. v. EPA*, 134 S. Ct. 2427 (2014).................................41

iv

# TABLE OF AUTHORITIES
## (cont.)

Page(s)

*Croplife v. EPA*,
    329 F.3d 876 (D.C. Cir. 2003) ................................................................44

*CTIA-The Wireless Ass'n v. FCC*,
    466 F.3d 105 (D.C. Cir. 2006) ..............................................................44

*Daimler Trucks N. Am. LLC v. EPA*,
    737 F.3d 95 (D.C. Cir. 2013) ..........................................................20, 55

*Devia v. Nuclear Regulatory Comm'n*,
    492 F.3d 421 (D.C. Cir. 2007) ..............................................................42

*Diamond Shamrock Corp. v. Costle*,
    580 F.2d 670 (D.C. Cir. 1978) ..............................................................42

*Eagle-Picher Indus. Inc. v. EPA*,
    759 F.2d 905 (D.C. Cir. 1985) ..............................................................40

*Envtl. Integrity Project v. EPA*,
    425 F.3d 992 (D.C. Cir. 2005) ..............................................................20

*Ergon-W. Va., Inc. v. EPA*,
    896 F.3d 600 (4th Cir. 2018) ................................................................15

*Gen. Elec. v. EPA*,
    290 F.3d 377 (D.C. Cir. 2002) ..............................................................43

*Hermes Consol., LLC v. EPA*,
    787 F.3d 568 (D.C. Cir. 2015) ........................................................14, 36

*Kennecott Utah Copper Corp. v. Dep't of Interior*,
    88 F.3d 1191 (D.C. Cir. 1996) ......................................44, 46, 47, 48

*Lion Oil Co. v. EPA*,
    792 F.3d 978 (8th Cir. 2015) ............................................................2, 14

*Louisiana Envtl. Action Network v. Browner*,
    87 F.3d 1379 (D.C. Cir. 1996) ..............................................................42

**TABLE OF AUTHORITIES**
**(cont.)**

Page(s)

*Marseilles Land and Water Co. v. FERC*,
    345 F.3d 916 (D.C. Cir. 2003) ........................................................... 23

*Massachusetts v. EPA*,
    549 U.S. 497 (2007) ........................................................................... 18

*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto Ins. Co.*,
    463 U.S. 29 (1983) ............................................................................. 19

*Nat. Res. Def. Council v. EPA*,
    559 F.3d 561 (D.C. Cir. 2009) ........................................................... 42

*Nat. Res. Def. Council v. EPA*,
    777 F.3d 456 (D.C. Cir. 2014) ........................................................... 32

*Nat. Res. Def. Council v. Thomas*,
    838 F.2d 1249 (D.C. Cir. 1988) ......................................................... 34

*Nat'l Ass'n of Mfrs. v. U.S. Dep't of Interior*,
    134 F.3d 1095 (D.C. Cir. 1998) ......................................................... 46

*Nat'l Biodiesel Bd. v. EPA*,
    843 F.3d 1010 (D.C. Cir. 2016) ................................................... 21, 43

*\*Nat'l Envtl. Dev. Ass'n's Clean Air Project v. EPA*,
    752 F.3d 999 (D.C. Cir. 2014) ....................................... 19, 21, 30, 33

*Nat'l Mining Ass'n v. Dept. of Interior*,
    70 F.3d 1345 (D.C. Cir. 1995) ........................................................... 39

*Nat'l Petrochemical & Refiners Ass'n v. EPA*,
    630 F.3d 145 (D.C. Cir. 2010), *reh'g denied*,
    643 F.3d 958 (D.C. Cir. 2011), *cert. denied*, 132 S. Ct. 571 (2011) ........... 21, 55

*New Jersey v. EPA*,
    517 F.3d 574 (D.C. Cir. 2008) ........................................................... 28

# TABLE OF AUTHORITIES
## (cont.)

Page(s)

*Nixon v. Missouri Municipal League*,
    541 U.S. 125 (2004)...............................................................51

*Nuclear Energy Inst. Inc. v. EPA*,
    373 F.3d 1251 (D.C. Cir. 2004)........................................43

*Occupy Eugene v. Gen. Servs. Admin.*,
    43 F. Supp. 3d 1143 (D. Or. 2014)..................................23

*Ohio v. EPA*,
    838 F.2d 1325 (D.C. Cir. 1988)........................................44

*Oljato Chapter of the Navajo Tribe v. Train*,
    515 F.2d 654 (D.C. Cir. 1975)....................................47, 48

*Randolph-Sheppard Vendors of Am. v. Weinberger*,
    795 F.2d 90 (D.C. Cir. 1986)............................................48

*Reno v. Catholic Social Servs. Inc.*,
    509 U.S. 43 (1993)...........................................................42

*S. Ill. Power Coop. v. EPA*,
    863 F.3d 666 (7th Cir. 2017) .........................................34

*Ivy Sports Med. LLC v. Burwell*,
    767 F.3d 81 (D.C. Cir. 2014)...........................................21

*Shays v. FEC*,
    528 F.3d 914 (D.C. Cir. 2008).........................................23

*Shell Oil Co. v. EPA*,
    950 F.2d 741 (D.C. Cir. 1992)....................................40, 55

*\*Sierra Club v. EPA*,
    551 F.3d 1019 (D.C. Cir. 2008)..........................44, 46, 47

*Sierra Club v. EPA*,
    699 F.3d 530 (D.C. Cir. 2012)........................................55

# TABLE OF AUTHORITIES
## (cont.)

Page(s)

*Sierra Club v. EPA,*
  705 F.3d 458 (D.C. Cir. 2013) .......................................................................... 28

*Sierra Club v. EPA,*
  762 F.3d 971 (9th Cir. 2014) ........................................................................... 30

*Sierra Club de Puerto Rico v. EPA,*
  815 F.3d 22 (D.C. Cir. 2016) ........................................................................... 39

*Sierra Club v. Johnson,*
  623 F. Supp. 2d 31 (D.D.C. 2009) .............................................................. 35, 36

*Sinclair Wyo. Ref. Co. v. EPA,*
  887 F.3d 986 (10th Cir. 2017) .............................................. 14, 16, 36, 45, 49

*Sugar Cane Growers Coop. of Fla. v. Veneman,*
  289 F.3d 89 (D.C. Cir. 2002) ...................................................................... 18, 21

*Toilet Goods Ass'n, Inc. v. Gardner,*
  387 U.S. 158 (1967) ......................................................................................... 42

*Weyerhaeuser Co. v. Costle,*
  590 F.2d 1011 (D.C. Cir. 1978) ................................................................. 19, 24

*\*Whitman v Am. Trucking Ass'ns,*
  531 U.S. 457 (2001) .................................................................................... 28, 29

## FEDERAL STATUTES AND LEGISLATIVE MATERIALS

5 U.S.C. §551(4) ................................................................................................ 20

5 U.S.C. §553(b) ................................................................................................ 20

5 U.S.C. §553(c) ................................................................................................ 20

42 U.S.C. §7545(o) .............................................................................................. 6

## TABLE OF AUTHORITIES
### (cont.)

Page(s)

42 U.S.C. §7545(o)(1)(K) ...................................................................8

42 U.S.C. §7545(o)(2) ...........................................................5, 7, 17, 49

*42 U.S.C. §7545(o)(2)(A) ....................... 1, 7, 8, 22, 33, 39, 52

42 U.S.C. §7545(o)(2)(B) ...................................................................7

*42 U.S.C. §7545(o)(3) ...............................................................7, 52

42 U.S.C. §7545(o)(3)(B) .................................................................39

*42 U.S.C. §7545(o)(5) ......................................................................8

*42 U.S.C. §7545(o)(5)(A) ..............................................9, 22, 26, 27

*42 U.S.C. §7545(o)(5)(C) .............................................................8, 27

*42 U.S.C. §7545(o)(5)(D) .............................................................7, 30

42 U.S.C. §7545(o)(7) ...............................................................25, 53

*42 U.S.C. §7545(o)(7)(A) ...........................................................7, 53

42 U.S.C. §7545(o)(7)(D) .................................................................53

42 U.S.C. §7545(o)(7)(E) .................................................................53

*42 U.S.C. §7545(o)(9) ...........................................................1, 49, 51

*42 U.S.C. §7545(o)(9)(A) ..................................................................8

*42 U.S.C. §7545(o)(9)(B) ...........................................................4, 8, 9

*42 U.S.C. §7545(o)(9)(C) .............................................................9, 27

*42 U.S.C. §7607(b) .............................................1, 2, 3, 33, 39, 40

*42 U.S.C. §7607(d) ...........................................................19, 20, 21

# TABLE OF AUTHORITIES
## (cont.)

**Page(s)**

42 U.S.C. §7607(h) ...................................................................................20

Energy Policy Act of 2005, Pub. L. No. 109-58, 119 Stat. 594 (2005)....................6

Energy Independence and Security Act of 2007, Pub. L. No. 110-140, 121 Stat. 1492 (2007)..........................................................6, 17

S. Rep. No. 110-65 (2007) .................................................................6, 17

S. Rep. No. 111-45 (2009) ...................................................................11

H.R. Rep. No. 111-278 (2009)..............................................................11

Hearing before Subcommittee on Environment, House Committee on Energy and Commerce, July 25, 2018, Preliminary Tr., *available at* https://docs.house.gov/meetings/IF/IF18/20180725/108610/HHRG-115-IF18-Transcript-20180725.pdf ...........................................15, 16

## ADMINISTRATIVE MATERIALS

40 C.F.R. §23.3 ...............................................................................2

40 C.F.R. §80.1126 ...........................................................................9

40 C.F.R. §80.1141(e)....................................................................9, 10

40 C.F.R. §80.1405(c).........................................................................7

40 C.F.R. §80.1407 ............................................................................7

40 C.F.R. §80.1425 ...................................................................8, 22, 23

*40 C.F.R. §80.1426 ..................................................................8, 22, 23

40 C.F.R. §80.1427 .....................................................................8, 22

## TABLE OF AUTHORITIES
### (cont.)

Page(s)

*40 C.F.R. §80.1427(a) ................................................................. 8, 22, 31

40 C.F.R. §80.1428 ...................................................................... 8, 22

*40 C.F.R. §80.1428(c) ................................................................. 8, 22, 31

40 C.F.R §80.1429 ....................................................................... 8, 22

*40 C.F.R. §80.1429(b) ................................................................ 11, 28, 50

40 C.F.R. §80.1429(g) .................................................................. 31

40 C.F.R. §80.1431(a) .................................................................. 31, 32

*40 C.F.R. §80.1441 ................................................ 4, 10, 12, 24, 30, 37, 40, 51, 56

*40 C.F.R. §80.1441(e) ................................................................. 10, 11, 29, 50

40 C.F.R. §80.1460(b) .................................................................. 31

40 C.F.R. §80.1460(e) .................................................................. 31

50 Fed. Reg. 7268 (Feb. 21, 1985) ................................................... 2

72 Fed. Reg. 23,900 (May 1, 2007) .................................................. 9, 10, 22, 27

75 Fed. Reg. 14,670 (Mar. 26, 2010) ................................................ 3, 10, 21, 28

75 Fed. Reg. 76,790 (Dec. 9, 2010) .................................................. 11, 37

77 Fed. Reg. 1320 (Jan. 9, 2012) ..................................................... 3, 11, 12, 32

79 Fed. Reg. 42,128 (July 18, 2014) ................................................. 3, 12

80 Fed. Reg. 77,420 (Dec. 14, 2015) ................................................ 3, 24

81 Fed. Reg. 89,746 (Dec. 12, 2016) ................................................ 3, 24

82 Fed. Reg. 58,486 (Dec. 12, 2017) ................................................ 3, 24, 38

# TABLE OF AUTHORITIES
## (cont.)

**Page(s)**

83 Fed. Reg. 32,024 (July 10, 2018)......................................................14, 25, 46, 54

EPA, *Annual Compliance Data for Obligated Parties and Renewable Fuel Exporters under the Renewable Fuel Standard (RFS) Program*, Table 2, https://www.epa.gov/fuels-registration-reporting-and-compliance-help/annual-compliance-data-obligated-parties-and#total-rvo (data current as of Oct. 10, 2018) ....................................12

EPA, *Small Refinery Exemptions*, https://www.epa.gov/fuels-registration-reporting-and-compliance-help/rfs-small-refinery-exemptions (last updated Dec. 18, 2018)............................................................45

Authorities chiefly relied upon are indicated by an asterisk (\*)

# GLOSSARY OF ACRONYMS AND ABBREVIATIONS

Pursuant to Circuit Rule 28(a)(3), the following is a glossary of acronyms and abbreviations used in this brief:

| | |
|---|---|
| DOE | U.S. Department of Energy |
| EPA | U.S. Environmental Protection Agency |
| HollyFrontier | HollyFrontier Refining & Marketing LLC and HollyFrontier Cheyenne Refining LLC |
| Petitioner | Producers of Renewables United for Integrity Truth and Transparency |
| Respondent-Intervenors | HollyFrontier and Sinclair Oil |
| RFS | Renewable Fuel Standard |
| RFS1 | Renewable Fuel Standard, as enacted in 2005 |
| RFS2 | Renewable Fuel Standard, as amended in 2007 |
| RIN | Renewable Identification Number |
| Sinclair Oil | Sinclair Wyoming Refining Company and Sinclair Casper Refining Company |

# JURISDICTIONAL STATEMENT

Under the Clean Air Act's Renewable Fuel Standard (RFS) program, EPA is charged with "ensur[ing]" specified volumes of renewable fuel be sold or introduced into commerce *nationally* each year. 42 U.S.C. §7545(o)(2)(A)(i). To do so, obligated parties (*i.e.*, refineries) must obtain and submit Renewable Identification Numbers (RINs), reflecting their portion of the overall annual volume obligation. Small refineries had a temporary exemption from the volume obligations through 2010, after which they could obtain an "extension" of the temporary exemption based on disproportionate economic hardship if required to comply. *Id.* §7545(o)(9). The Clean Air Act provides for judicial review under 42 U.S.C. §7607(b).

In June of 2018, Petitioner became aware that EPA allows small refineries to generate[1] RINs that represent previously expired or retired RINs, rather than production of biofuels by the refinery, as a result of exemptions granted "retroactively" (referred to as "Small Refinery RINs").[2] This rule was made through closed-door "informal adjudications."[3] Because these decisions were not published

---

[1]    EPA and Respondent-Intervenors may prefer other terms—*e.g.*, "un-retire," reinstate, replace—but they all mean creating RINs anew to be used for compliance purposes, *i.e.*, generation. For purposes of this brief, Petitioner intends the term "generate" or "generation" to encompass these terms.

[2]    This was based on an article related to Respondent-Intervenors. *See* 6/1/2018 OPIS article (JA820), cited in Doc. #1743716.

[3]    R-7 to R-11 (JA904-941). EPA treats these decisions as confidential business information and does not release them to the public. Thus, Petitioner could only

in the Federal Register, the time for seeking judicial review under the Clean Air Act has not yet run. 42 U.S.C. §7607(b)(1), *cited in* EPA's Opp'n to Pet'r's Mot. to Compel and to Stay Briefing at 5, *Advanced Biofuels Ass'n v. EPA*, No. 18-1115 (D.C. Cir. filed July 6, 2018) [Doc. #1739561]; *see also Lion Oil Co. v. EPA*, 792 F.3d 978, 981-82 (8th Cir. 2015) (finding EPA did not "publish" exemption decision).[4] RIN generation and use are elements of nationally applicable regulations, and, thus, challenges to EPA's decision to allow Small Refinery RINs are properly before the D.C. Circuit. *See* Section II.D.

In July 2018, EPA finally indicated it recently expanded the number of exemptions granted, indicating EPA was granting "new" exemptions not simply granting extensions, and it was *receiving* and granting those exemptions even after the compliance year ended and the demonstration deadlines passed, indicating the potential for a significant number of Small Refinery RINs in the market.[5] This confirmation of Petitioner's new fears ripened its claims and reopened and raised

---

reference public information to identify the final agency actions in its Petition for Review. EPA and Respondent-Intervenors may quibble about their proper identification, but they cannot dispute that the parties were on notice and the agency determinations identified are final and have legal effect.

[4]      Although 40 C.F.R. §23.3 includes a timing provision for non-Federal Register documents, it applies only to potential litigants having actual notice of unpublished decisions. *See* 50 Fed. Reg. 7268, 7269 (Feb. 21, 1985) (noting those who have "no notice of the action …addresses a matter not within the scope of this rulemaking").

[5]      Ex. C to Opp'n to Mot. to Dismiss [Doc. #1764330] (JA836-837).

new grounds for seeking judicial review of EPA's interpretation of allowing

petitions for exemptions "at any time"[6] and without accounting for the exempted

volumes (*i.e.*, retroactive grants of exemptions),[7] which resulted in the standards

EPA set for compliance years 2016, 2017 and 2018 not "ensuring" the required

volumes.[8] *See* Section III.A.

Because EPA's actions are not in compliance with the statute or its

regulations, Petitioner filed this Petition for Review. For the reasons noted above,

and more fully explained below, this Court has jurisdiction over the Petition for

Review under 42 U.S.C. §7607(b)(1).

## STATEMENT OF ISSUES

1)    Whether EPA impermissibly allowed Small Refinery RINs through

closed-door informal adjudications, rather than rulemaking where the statute

requires regulations.

---

[6]    75 Fed. Reg. 14,670, 14,881 (Mar. 26, 2010) (JA694); 79 Fed. Reg. 42,128, 42,163 (July 18, 2014) (JA741). The Petition for Review identified a challenge to 40 C.F.R. §80.1441, citing the Federal Register notices promulgating and amending this regulation to give the Court a full picture of the games of hide and seek EPA has played with the public on its handling of the small refinery exemptions.

[7]    77 Fed. Reg. 1320, 1340 (Jan. 9, 2012) (JA719); *see infra* n.37.

[8]    80 Fed. Reg. 77,420, 77,511 (Dec. 14, 2015) (JA748); 81 Fed. Reg. 89,746, 89,800 (Dec. 12, 2016) (JA797); 82 Fed. Reg. 58,486, 58,523 (Dec. 12, 2017) (JA805).

2)      Where the statute and EPA regulations limit when, how and who can generate credits (*i.e.,* RINs) under the RFS, whether EPA's allowance of Small Refinery RINs was arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law.

3)      Where EPA regulations prohibit use of invalid RINs, whether EPA exceeded its authority in allowing for transfer and use of Small Refinery RINs.

4)      Whether EPA has impermissibly and arbitrarily reduced the annual RFS volume requirements outside its limited waiver authority by allowing retroactive grants of exemptions (and attendant Small Refinery RINs) based on the phrase "at any time" in 42 U.S.C. §7545(o)(9)(B).

5)      Whether EPA's retroactive grants of exemptions violate the requirements of 40 C.F.R. §80.1441.

6)      Whether 40 C.F.R. §80.1441 is arbitrary and capricious because it does not ensure the minimum applicable volumes under the RFS by allowing petitions "at any time" without providing means to account for the late exempted volumes and Small Refinery RINs.

7)      Whether EPA's failure to ensure the minimum applicable volumes for 2016, 2017 and 2018 due to retroactive grants of exemptions and Small Refinery RINs was arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law.

8)      Whether EPA otherwise followed the procedural requirements of the Clean Air Act in amending its RFS regulations related to small refinery exemptions through informal adjudications and, thereby, failing to respond to public comments.

## STATUTES AND REGULATIONS

Relevant statutes and regulations appear in an addendum to this brief.

## STATEMENT OF THE CASE

Congress sought to promote production of renewable fuels by requiring increasing amounts of biofuels in the transportation fuel market each year under the RFS program. 42 U.S.C. §7545(o)(2). Congress obliged EPA to promulgate regulations that would ensure these volumes. *Id.* Biofuel producers have acted and made substantial investments in reliance of the RFS.

Secretly, EPA has undermined the program's volume requirements, and threatens to continue to do so, under the guise of the "small refinery exemption" provision. This provision gave small refineries a "temporary" exemption from the RFS program to provide more time to come into compliance, but recently EPA has impermissibly expanded and even used the exemption to allow for the generation of RINs to represent RINs that have expired or previously retired, rather than through biofuel production. Without public input, EPA created new avenues to generate credits and to reduce the volume requirements, thereby increasing the supply of RINs and reducing demand for and devaluing credits generated by biofuel producers,

that are nowhere found in the statute or EPA's regulations. The uncertainty caused by EPA's actions have wreaked havoc on the market Congress sought to support and requires Court intervention.

## STATEMENT OF FACTS

### A.    The RFS Program

In 2005, Congress established the RFS program, 42 U.S.C. §7545(o), requiring specified minimum amounts of renewable fuel be sold or introduced into commerce in the United States each year (RFS1). Pub. L. No. 109-58, §1501(a)(2), 119 Stat. 594, 1067 (2005). In 2007, Congress expanded the RFS (RFS2) to include, among other things, specific requirements for advanced biofuels to increase domestic production of renewable fuels, which provides environmental, economic, and energy security benefits. *See* Pub. L. No. 110-140, §§201, 202, 121 Stat. 1492, 1519-28 (2007); S. Rep. No. 110-65 at 2-3 (2007). The RFS is a "market forcing policy" intended to create "demand pressure" for renewable fuels. *Ams. for Clean Energy v. EPA*, 864 F.3d 691, 705, 710 (D.C. Cir. 2017) (citations omitted). The demand pressure is created by the minimum applicable volumes required each year.

USCA Case #18-1202    Document #1780383    Filed: 04/01/2019    Page 28 of 79

To effectuate the statute's volume requirements,[9] EPA translates the minimum applicable volumes for the applicable compliance year into annual percentage standards the year before. 42 U.S.C. §7545(o)(2), (o)(3). Considering estimates from the U.S. Energy Information Administration, EPA utilizes a formula to set the standards based on the minimum applicable volume required divided by the estimated amount of "obligated" transportation fuel; that is, the projected amount of gasoline or diesel fuel refined in or imported into the contiguous United States and Hawaii subject to the RFS requirements. 40 C.F.R. §§80.1405(c), 80.1407.

Congress constrained EPA's authority to reduce the statutorily required volumes to when EPA finds, after notice and comment,[10] there is "inadequate domestic supply" or the requirements would cause severe economic or environmental harm. 42 U.S.C. §7545(o)(7)(A). The statute also allows obligated parties to carry a deficit if they cannot meet the volume requirements. *Id.* §7545(o)(5)(D).

The statute requires EPA to promulgate regulations to ensure the volumes, establish compliance provisions, and create a "credit" program. 42 U.S.C.

---

[9]    The statute specifies minimum applicable volumes for renewable fuel, advanced biofuel, and cellulosic biofuel through 2022 and for biomass-based diesel through 2012, after which EPA sets the volumes. 42 U.S.C. §7545(o)(2)(B)(i-ii).
[10]    The statute also requires consultation with the U.S. Department of Energy (DOE) and the U.S. Department of Agriculture.

§§7545(o)(2)(A)(i, iii), (o)(5). To show compliance with these volume obligations, EPA established, through rulemaking, the "Renewable Identification Number" or "RIN," outlining when and how these RINs can be generated. 40 C.F.R. §§80.1425, 80.1426. Obligated parties must obtain RINs by purchasing renewable fuel with RINs assigned or purchasing RINs that have been separated from the physical gallon of fuel. *Id.* §§80.1427-80.1429. In the latter case, obligated parties need not purchase or blend renewable fuel, rather they can rely on the acts of others. These RINs represent the "credits" Congress required, which have a limited life of twelve months. 42 U.S.C. §7545(o)(5)(C). Under EPA's regulations, RINs can only be retired once and, if not used for compliance in the year generated or the next year, the RIN expires and cannot be used. 40 C.F.R. §§80.1427(a)(6)(ii), 80.1428(c).

## B.    Small Refinery Exemptions

Congress provided "small refineries" a "temporary exemption" from the volume requirements until calendar year 2011. 42 U.S.C. §7545(o)(9)(A)(i). A "small refinery" is "a refinery for which the average aggregate daily crude oil throughput for a calendar year … does not exceed 75,000 barrels." *Id.* §7545(o)(1)(K). This temporary exemption could be "extend[ed]" based on a finding by DOE of "disproportionate economic hardship if required to comply." *Id.* §7545(o)(9)(A)(ii). "[A]t any time," a small refinery could also petition EPA for an "extension" based on "disproportionate economic hardship." *Id.* §7545(o)(9)(B). In

8

evaluating such petitions, EPA consults DOE and can consider other economic factors. *Id.* EPA is to act on these petitions within 90 days. *Id.* The statute allows small refineries to generate credits (*i.e.,* RINs), but only if the small refinery "waives the exemption." *Id.* §§7545(o)(9)(C), (o)(5)(A)(iii).

EPA promulgated regulations implementing RFS1 in 2007. 72 Fed. Reg. 23,900 (May 1, 2007). EPA established the RIN as the compliance and credit mechanism, outlining when, how and by whom RINs can be generated; that is, RINs are generated upon production or importation of renewable fuel. *Id.* at 23,908 (JA656); *see also* 40 C.F.R. §80.1126.

EPA acknowledged it must account for exempt small refineries in setting the annual percentage standards to ensure the RFS volumes by " excluding their gasoline volumes from the overall non-renewable gasoline volume used to determine the applicable percentage." 72 Fed. Reg. at 23,911 (JA659). "EPA believes this is appropriate because the percentage standard should be based only on the gasoline subject to the renewable volume obligation." *Id.* EPA further stated that "[b]eginning in 2011, small refineries will be required to meet the same renewable fuel obligation as all other refineries, unless their exemption is extended pursuant to §80.1141(e)." *Id.* at 23,924 (JA662). EPA acknowledged that only a small refinery that waives the exemption may separate and transfer RINs "like any other obligated party." *Id.* at 23,926 (JA664). "If a refiner does not waive the exemption, the refiner could still

separate and transfer RINs, but only for the renewable fuel that the refiner itself blends into gasoline (*i.e.* the refinery operates as an oxygenate blender facility)." *Id.* EPA's regulations allowed small refineries to "petition EPA for an extension of the small refinery exemption." *Id.*; 40 C.F.R. §80.1141(e).

In 2010, EPA promulgated regulations implementing RFS2. 75 Fed. Reg. at 14,670 (JA681). EPA largely retained the RIN-system and small refinery exemption regulations from RFS1. *Id.* at 14,675 (JA683), 14,684 (JA684); *see also* 40 C.F.R. §80.1441. Commenters argued EPA should not extend the exemptions beyond 2011 (*see, e.g.*, EPA-HQ-OAR-2005-0161-2132 at 14 (JA698); EPA-HQ-OAR-2005-0161-2329 at 73-74 (JA702-703)), while others supported continued extensions (*see, e.g.*, EPA-HQ-OAR-2005-0161-2233 at 12 (JA700)).

EPA re-confirmed that exempted small refineries would be accounted for in setting the percentage standards. 75 Fed. Reg. at 14,717-14,718 (JA686-687). But EPA indicated that DOE found "small refineries would not be subject to disproportionate economic hardship" and "the exemption should not, on the basis of the study, be extended." *Id.* at 14,736 (JA690). While §80.1441 contemplated EPA could grant petitions to nonetheless extend the temporary exemption, it also required the small refinery to identify the hardship it "would face" and "the date the refiner anticipates that compliance with the requirements can reasonably be achieved at the small refinery," indicating such requests were to be prospective in nature. 40 C.F.R.

§80.1441(e)(2)(i). EPA regulations again limited the ability of exempt small refineries to separate RINs, which would not make sense if the exemptions were sought after the extension ended or granted during or after the compliance year. *Id*. §80.1429(b)(8).

For compliance year 2011, EPA anticipated all small refineries would be participating in the program. 75 Fed. Reg. 76,790, 76,804 (Dec. 9, 2010) (JA708). Inclusion of small refineries reduced the percentage standards due to the increase in the number of obligated parties. *Id.* at 76,793 (JA706). But Congress had requested a revised DOE study in an Appropriations Bill. S. Rep. No. 111-45 at 109 (2009); H.R. Rep. No. 111-278 at 39 (2009). EPA indicated it was waiting for DOE's revised study before acting on three petitions it had received. 75 Fed. Reg. at 76,805 (JA709). In March 2011, DOE issued its revised (redacted) study, recommending 13 small refineries receive the automatic extension through 2012. *See* EPA-HQ-OAR-2010-0133-0119 at 37 (JA724).[11]

For compliance year 2012, EPA adjusted the standards to account for "these few [exempt] refineries." 77 Fed. Reg. at 1323 (JA715), 1340 (JA719). In the 2012

---

[11]    DOE sent surveys to 59 small refineries, receiving 18 responses. EPA-HQ-OAR-2010-0133-0119 at vii (JA722). Several of the refineries receiving the temporary exemption are part of large integrated oil companies or large geographically diverse refiners, some of which notified DOE that they were not responding "because they did not believe they faced disproportionate economic hardship." *Id.*

RFS proposal, EPA stated that "requests for exemptions that are approved after the release of the final 2012 RFS standards will not affect the 2012 standards," because EPA was concerned with uncertainty stemming from revising the standards. *Id.* at 1340 (JA719). Commenters objected to EPA's approach, including EPA's failure to provide notice-and-comment on extension requests.[12] *Id.* Commenters also "suggested requiring petitions to be submitted in time to be considered in the annual standard-setting process" and accounting for the exempted volumes. *Id.* EPA simply responded it need not ensure the volumes are "precisely" met. *Id.* This, however, was only preamble language provided in the abstract, and, despite the exemptions, the 2012 volume requirements were exceeded.[13]

In 2014, EPA amended 40 C.F.R. §80.1441 to require small refineries seeking extensions "be projected to meet the 'small refinery' definition" during the desired exemption period, clarifying that failure to do so "for any calendar year for which an exemption was granted would invalidate the exemption for that calendar year." 79 Fed. Reg. at 42,163 (JA741). Again, this indicated the petitions would seek

---

[12]    *See, e.g.,* EPA-HQ-OAR-2010-0133-0163 at 6-8 (JA730-732); EPA-HQ-OAR-2010-0133-0159 at 8-10 (JA726-728).
[13]    *See* EPA, *Annual Compliance Data for Obligated Parties and Renewable Fuel Exporters under the Renewable Fuel Standard (RFS) Program*, Table 2, https://www.epa.gov/fuels-registration-reporting-and-compliance-help/annual-compliance-data-obligated-parties-and#total-rvo (data current as of Oct. 10, 2018) (JA874-879).

prospective relief. In no case did EPA discuss the timing of those submittals much less indicate they could be submitted and/or granted after the compliance year or after the compliance demonstration deadlines.

And, EPA made no mention of the potential for "un-retiring" RINs, much less explain its authority to do so. (It has none.) This is important because, once RINs are retired or expire, they are no longer available for use. Taking RINs out of the market supports biofuel production to meet the remaining or upcoming volume requirements. As such, RIN availability is tracked carefully by market participants to project demand and supply for planning and investment. Artificially increasing RIN supply (and without explanation) sends signals to the market that are contrary to those Congress intended in establishing a mandate for *increased production.*

## C.    EPA's Recent Handling of Small Refinery Exemptions

In 2018, rumors began surfacing that EPA had received a significant increase in the number of petitions for *extensions* compared to prior years. Because the statute, EPA regulations, and the DOE Study indicated a limited universe of exemptions that could still be extended, the public raised concerns regarding these reports, urging EPA to respond and to ensure the required RFS volumes.[14]

---

[14]     *See, e.g.,* Exs. B and D to Opp'n to Mot. to Dismiss [Doc. #1764330] (JA831-835, JA838-845).

On June 1, 2018, it was reported that EPA allowed Respondent-Intervenors to generate current-year RINs (*e.g.,* 2018), purportedly as a result of EPA's reversal of an earlier denial of an extension.[15] The reversal was reportedly based on *Sinclair Wyoming Refining Co. v. EPA ("Sinclair Oil")*, 887 F.3d 986 (10th Cir. 2017), where the Tenth Circuit determined EPA could not require a small refinery to show it would not be economically viable to obtain an exemption and remanded EPA's denial. *Sinclair Oil* did not require EPA to subsequently grant an exemption[16] and made no reference to any retired RINs, much less discuss what happens to any such RINs if EPA reversed its decision.[17]

In June 2018, EPA also revealed the exempted small refinery volumes ballooned, stating "approximately 1.46 *billion* RINs were not required to be retired by small refineries that were granted hardship exemptions for 2017 and approximately 790 million RINs were not required to be retired by small refineries that were granted hardship exemptions for 2016." 83 Fed. Reg. 32,024, 32,029 (July 10, 2018) (JA825). EPA confirmed this in a letter sent to Senator Grassley on July 12, 2018.[18] EPA also noted receiving a higher number of petitions for compliance

---

[15]    *See, supra* n.2.
[16]    *Lion Oil*, 792 F.3d at 978 (finding EPA reasonably considered profitability and competitiveness in assessing *hardship*); *Hermes Consol., LLC v. EPA*, 787 F.3d 568, 575 (D.C. Cir. 2015) (same).
[17]    The filings in this case are under seal.
[18]    Ex. C to Opp'n to Mot. to Dismiss [Doc. #1764330] (JA836-837).

year 2016 than previously indicated it had received, showing it was not just granting exemptions after the standards were set, but that it was actually receiving and granting them well after the compliance years and demonstration deadlines. The news regarding "new" RINs for late exemptions raised real (not abstract) concerns of significant numbers of retired or expired RINs flooding the market.[19] EPA data also subsequently showed the 2016 and 2017 volumes were not met.[20]

The RIN market reacted. RIN prices fell, and estimated demand was reduced, adversely impacting biofuel producers.[21] Testimony from economists and RFS consultants before a House subcommittee on July 25, 2018 confirmed the adverse market impacts of EPA's actions[22] and that other refineries would seek similar treatment as Respondent-Intervenors:  "Well, if they've already retired RINs then they'll seek EPA's permission to get those RINs back again, and as we've talked

---

[19]     *See* Exs. B and D to Opp'n to Mot. to Dismiss [Doc. #1764330] (JA831-835, JA838-845). Also, in July, the U.S. Court of Appeals for the Fourth Circuit reversed another denial of a small refinery exemption. *See Ergon-W. Va., Inc. v. EPA*, 896 F.3d 600 (4th Cir. 2018).

[20]     *See, supra* n.13.

[21]     Cain Decl. ¶¶23-34.

[22]     RIN prices were "relatively calm" in 2015 and 2016, but, "with the administrative change," there was "policy uncertainty-driven price behavior." Hearing before Subcommittee on Environment, House Committee on Energy and Commerce, July 25, 2018, Preliminary Tr. at 1120-1124, *available at* https://docs.house.gov/meetings/IF/IF18/20180725/108610/HHRG-115-IF18-Transcript-20180725.pdf. EPA's actions "likely undermined RIN markets." *Id.* at 649-654.

about, that does come back into the market."[23] Because Petitioner believes the RINs are invalid and EPA's actions represent a sea change from EPA's regulations, it filed this Petition for Review.

Finally, in response to Petitioner's motion for stay, EPA filed (under seal) the decision documents in which it determined that Respondent-Intervenors could generate Small Refinery RINs. [Doc. #1762885, Attach. A-E]. This determination "can be found within" EPA's decision document reflecting EPA's finding, after *Sinclair Oil*, that Respondent-Intervenors were entitled to an exemption before 2016. [Doc. #1770215 at 1]. There is no regulatory authority cited by EPA to support any claim that it can allow the "un-retiring" of RINs.

The Court's December 21, 2018 order requires Petitioner to address the claims raised in EPA's Motion to Dismiss in the merits brief [Doc. #1765529]. EPA, however, claims the record is limited. Because of EPA's lack of transparency and shell games, Petitioner must reference other documents to respond to EPA's arguments and to ensure meaningful judicial review.

## SUMMARY OF ARGUMENT

The RFS is a prospective statute, providing parties a phased-in mandate that increases over time to promote its environmental, economic, and energy security

---

[23]     *Id.* at 1987-1990.

goals. Congress imposed constraints on EPA authority and sought to provide real market-forcing incentives. EPA has undermined those incentives by circumventing those constraints and expanding its authority through small refinery exemptions.

While EPA is taking every effort to avoid judicial oversight, the public cannot be faulted because EPA acted in secret, withholding crucial information needed to raise its objections. EPA acted in secret, because EPA has invented discretion where Congress circumscribed it. In so doing, it violated its own regulations and acted arbitrarily. EPA's determination that it can allow retroactive requests for "extensions" and allow the "un-retiring" of RINs must be vacated, and EPA must undergo rulemaking to revise its regulations and process for reviewing such exemptions. In failing to issue regulations or set standards that ensure the volumes are met in the statute, EPA has also violated the statute, requiring EPA to reassess on remand how to make-up for the required volumes it intentionally waived for 2016, 2017 and 2018 in excess of its authority.

## STANDING

The RFS promotes production of biofuels, including biomass-based diesel and ethanol. *See* 42 U.S.C. §7545(o)(2); Pub. L. No. 110-140, 121 Stat. 1492; S. Rep. No. 110-65 at 2. Petitioner's members include companies that own and operate facilities that produce biomass-based diesel or ethanol, representing approximately 2 billion gallons of production capacity, and participate in the RFS program. The

group advocates for a more open and fair process in EPA's handling of small refinery exemptions. *See, e.g.,* EPA-HQ-OAR-2018-0167-1199. Participation of individual members in the litigation is not necessary.

Members of Petitioner have been injured by the challenged agency actions.[24] The RFS sets the market for biofuels. EPA's actions have reduced the need to purchase physical gallons of biofuel to meet the RFS. *See generally* Cain Decl. ¶¶7, 10, 16-23. Petitioner's members have relied on the volumes set by EPA, have lost sales, lost value for their product under previously entered contracts, lost customers, and, in some cases, have had to strand investments, as a result of EPA's actions and lost demand. EPA's actions also reduced RIN prices. Petitioner's members bear the risk of such losses and cannot recoup them. *Id.* ¶¶9, 24-32.

Petitioner and its members have also suffered injuries as a result of EPA's secrecy. *See Mass. v. EPA*, 549 U.S. 497, 518 (2007); *see also Sugar Cane Growers Coop. of Fla. v. Veneman*, 289 F.3d 89, 94–95 (D.C. Cir. 2002) (finding standing based on claimed "deprivation of a right to notice-and-comment rulemaking"). Regulatory certainty is needed for business planning and to support investment and financing. EPA's secret process as to how it implements small refinery exemptions has created uncertainty, adversely affecting the market for biomass-based diesel and

---

[24]     Petitioner previously filed under seal a declaration from an individual member, which further supports standing. [Doc. #1759893].

ethanol. Had EPA followed proper procedure, EPA would have had to support the legality and reasonableness of its actions, which it cannot.

## ARGUMENT

### I.  STANDARD OF REVIEW

The Clean Air Act requires the Court to determine whether the agency's actions were arbitrary and capricious, an abuse of discretion, in excess of statutory authority, or otherwise not in accordance with law. *See* 42 U.S.C. §7607(d)(9); *see also Alaska Dep't of Envtl. Conservation v. EPA*, 540 U.S. 461, 496-97 (2004). The arbitrary and capricious standard requires the agency to examine the relevant factors and articulate a satisfactory explanation for its action. *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983) (citation omitted). The agency also must "comply with its own regulations." *Nat'l Envtl. Dev. Ass'n's Clean Air Project v. EPA*, 752 F.3d 999, 1009 (D.C. Cir. 2014) (quoting *Environmentel, LLC v. FCC*, 661 F.3d 80, 85 (D.C. Cir. 2011)). The D.C. Circuit has stated that it will defer to an agency "so long as we are assured that its promulgation process as a whole and in each of its major aspects provides a degree of public awareness, understanding, and participation commensurate with the complexity and intrusiveness of the resulting regulations." *Weyerhaeuser Co. v. Costle*, 590 F.2d 1011, 1028 (D.C. Cir. 1978).

## II.    EPA'S ALLOWANCE OF SMALL REFINERY RINS VIOLATES THE STATUTE AND EPA'S OWN REGULATIONS AND IS ARBITRARY.

"[I]t is 'axiomatic' that 'administrative agencies may act only pursuant to authority delegated to them by Congress.'" *Air All. Houston v. EPA*, 906 F.3d 1049, 1060 (D.C. Cir. 2018) (citation omitted). EPA, through "informal adjudications" of retroactive "extensions" of exemptions, has allowed small refineries to generate RINs that represent previously retired or expired RINs, rather than new biofuel production. It is not surprising that EPA's actions here were done in secret—they are not authorized under the statute or its own regulations.

### A.    EPA Was Required to Undergo Rulemaking to Allow Generation of RINs by Small Refineries.

The importance of public participation in agency proceedings cannot be overstated. Notice of agency action is "crucial." *Daimler Trucks N. Am. LLC v. EPA*, 737 F.3d 95, 100 (D.C. Cir. 2013) (quoting *Int'l Union, United Mine Workers of Am. v. Mine Safety & Health Admin.*, 626 F.3d 84, 95 (D.C. Cir. 2010)) (internal quotation omitted); *see also Envtl. Integrity Project v. EPA*, 425 F.3d 992, 996 (D.C. Cir. 2005); 42 U.S.C. §7607(d), (h); 5 U.S.C. §553(b), (c). Rules include the whole *or a part* of an agency statement of general or particular applicability "designed to implement, interpret, or prescribe law or policy." 5 U.S.C. §551(4). The Small Refinery RINs allowed by EPA implement new law or policy; that is, it allows RINs for future use in a way not otherwise authorized.

This Court often reviews agency actions to determine whether rulemaking was required. *See Nat'l Biodiesel Bd. v. EPA*, 843 F.3d 1010 (D.C. Cir. 2016) (reviewing informal adjudication of alternative compliance approach under RFS); *Nat'l Envtl. Dev. Ass'n's Clean Air Project*, 752 F.3d at 1007 (reviewing EPA memorandum); *Sugar Cane Growers Co-Op.*, 289 F.3d at 95-96 (finding notice of program implementation a "rule"). Here, this Court need not debate long whether the actions challenged are "rules," with respect to RINs and compliance with the RFS volumes, Congress required regulations; that is, notice-and-comment rulemaking. *See Ivy Sports Med. LLC v. Burwell*, 767 F.3d 81, 84 (D.C. Cir. 2014).

Implementing the 2007 RFS amendments is a complex task. *See Nat'l Petrochemical & Refiners Ass'n v. EPA*, 630 F.3d 145, 156 (D.C. Cir. 2010), *reh'g denied*, 643 F.3d 958 (D.C. Cir. 2011), *cert. denied*, 132 S. Ct. 571 (2011) (citation omitted). EPA's implementation decisions often are "heavily informed by the many public comments" it receives. 75 Fed. Reg. at 14,673 (JA682). Regarding RFS2 implementation, EPA undertook notice-and-comment rulemaking. It was required to do so.[25] *See* 42 U.S.C. §7607(d)(1)(E) (requiring notice-and-comment for

---

[25]    EPA has acknowledged that agencies can, when appropriate, act through informal adjudication, *unless the statute requires rulemaking*. EPA Br., *Nat'l Biodiesel Bd. v. EPA*, No. 15-1072, at 28 (D.C. Cir. Feb. 11, 2016) [Doc. #1598456].

"promulgation or revision of any regulation pertaining to any fuel or fuel additive under section 7545 of this title").

Indeed, Congress required EPA to issue regulations, which were required to "contain compliance provisions applicable to refineries, blenders, distributors, and importers, as appropriate" that ensure the RFS volume requirements. 42 U.S.C. §7545(o)(2)(A)(i), (iii)(I). The regulations were also required to include a credit program. *Id.* §7545(o)(5)(A). A RIN is used to show compliance with the RFS volume requirements and to implement the statute's credit program. 72 Fed. Reg. at 23,929-23,930 (JA667-668). As such, the RFS regulations define when, how and by whom RINs can be generated and used. 40 C.F.R. §§80.1425-80.1429.

To show compliance, an obligated party must retire an appropriate number of RINs. 40 C.F.R. §80.1427(a). RINs cannot be used again once retired or expired. *See id.* §80.1427(a)(6)(ii) ("RINs used to demonstrate compliance in one year cannot be used to demonstrate compliance in any other year."); §80.1428(c) ("[A]n expired RIN will be considered an invalid RIN and cannot be used for compliance purposes."). Retired RINs can be reinstated in limited circumstances not applicable here. *Id.* §80.1427(a)(4)(iv) (allowing RFS1 RINs retired pursuant to §80.1129(e) because associated volume of fuel was not used as motor vehicle fuel to be reinstated for use in complying with a 2010 RVO pursuant to §80.1429(g)).

This case is not mere application of a rule. EPA's regulations do not provide any process for small refineries to generate RINs. *See* 40 C.F.R. §80.1426. Rather, RINs are generated upon the RIN-generator's *production* of biofuels. *Id.* §§80.1426, 80.1425 (listing RIN elements based on production of renewable fuel). Small Refinery RINs do not reflect production by the small refineries.

Instead, EPA simply asserts, without support, that it can "un-retire" RINs. But EPA is creating new authority from whole cloth. And, EPA was required to amend its regulations through rulemaking, not informal adjudications. *See Clean Air Council v. Pruitt*, 862 F.3d 1, 9 (D.C. Cir. 2017) (finding agency may not alter rules "without notice and comment") (citation omitted); *City of Idaho Falls, Idaho v. FERC,* 629 F.3d 222, 230 (D.C. Cir. 2011) (requiring rulemaking when changing methodology originally established through notice-and-comment); *Marseilles Land and Water Co. v. FERC*, 345 F.3d 916, 920 (D.C. Cir. 2003) ("For an administrative agency may not slip by the notice and comment rule-making requirements needed to amend a rule by merely adopting a *de facto* amendment to its regulation through adjudication."); *Occupy Eugene v. Gen. Servs. Admin.*, 43 F. Supp. 3d 1143, 1153-54 (D. Or. 2014) (finding condition placed in permit not provided by regulation required notice and comment); *cf. Shays v. FEC*, 528 F.3d 914, 930 (D.C. Cir. 2008) (finding adjudication appropriate where agency is "flesh[ing] out its rules").

EPA cannot contend that the public had notice and opportunity to comment in its earlier rulemakings. Access to the underlying support for an agency action, including data, is necessary for a meaningful opportunity to comment. *See Am. Radio Relay League, Inc. v. FCC*, 524 F.3d 227, 236-37 (D.C. Cir. 2008). EPA's secrecy and failure to provide crucial information as to its interpretation of §80.1441 and its claimed authority to "un-retire" RINs "improperly denied petitioners the opportunity to comment" as required. *Weyerhaeuser Co.*, 590 F.2d at 1030 (citation omitted).

At most, EPA indicated, in preamble not regulatory language, that it *may* grant extensions after the standards were set in November *of the prior year*. But EPA required these petitions to indicate when the small refinery anticipated it could reasonably come into compliance. It is difficult to see how a small refinery that *could and, even, did* comply would be entitled to a *hardship* exemption.[26] As such, there was no discussion of what happens if a small refinery can comply or actually complies but seeks and receives an exemption anyway. The public was not required to divine any such possibility. Indeed, such possibility was not imaginable, because it was not contemplated by the statute or EPA's regulations. *See* Section III.B. This

---

[26]     In setting the standards for 2014-2018, EPA also explained "available information shows that the impact on small entities from implementation of this rule will not be significant." 80 Fed. Reg. at 77,516 (JA750); 81 Fed. Reg. at 89,803 (JA800); 82 Fed. Reg. at 58,527 (JA809).

makes sense given the statute's market-forcing intent. The risk of having to comply should prompt small refineries to seek extensions sooner or longer, better ensuring the integrity of the standards used to meet the volume requirements. Moreover, Congress imposed limitations on when and how EPA can reduce the statutory volumes.[27] 42 U.S.C. §7545(o)(7). Merely referencing the possibility that EPA may grant exemptions after the standards are set does not provide sufficient notice.

Given Congress's clear direction to require rulemaking on actions affecting RFS compliance, EPA will likely turn to its claim that rulemaking was not required because EPA needed to provide a "meaningful" remedy considering the Tenth Circuit decision in *Sinclair Oil.* But the Tenth Circuit cannot grant EPA authority not provided by Congress; it cannot absolve EPA of its statutory obligations; and it cannot allow EPA to violate its own regulations. EPA also does not explain why it could not provide this "remedy" after rulemaking. Indeed, the biofuels industry is still waiting for EPA's response to this Court's remand in *Americans for Clean Energy v. EPA*, 864 F.3d 691 (D.C. Cir. 2017), regarding the 2016 volumes because of purported issues it may raise. 83 Fed. Reg. at 32,027 (JA824). Here, the numerous implications of EPA's action dictated seeking public input.

---

[27]    Small refinery exemptions are not grounds for a waiver. *See* Section III.C.

**B.      The Statute Does Not Authorize Generation of RINs by Small Refineries that Obtain an Exemption, Even if Late.**

Even if EPA could act through adjudication when the required regulations do not address the situation at hand, which it cannot, EPA incorrectly determined that allowing generation of Small Refinery RINs is consistent with the statute. It is not.

While EPA claims it must provide "value" to small refineries receiving a late exemption, EPA cites to no authority that allows it to "un-retire" RINs already submitted for compliance. EPA's regulations prohibit such actions. *See* Section II.C. That is because the statute removed any discretion EPA may have had to allow such RINs since they do not meet the requirements to constitute a "credit." As such, the statute does not give these RINs any value that EPA is required to replace.

The statute provides limited instances when a "credit" can be generated, which include: (i) generation of credits when any person refines, blends, or imports gasoline that contains a quantity of renewable fuel that is greater than the quantity required; (ii) generation of credits for biodiesel; and (iii) generation of credits by small refineries that have *waived* the small refinery exemption. *See* 42 U.S.C. §7545(o)(5)(A). None of these provisions apply.

Here, the RINs were not generated based on the small refinery refining, blending[28] or importing any renewable fuel, including biodiesel.[29] Although the record lacks any relevant information, EPA may contend that the Small Refinery RINs were first generated based on production by a biofuel producer. Even if true, this contention also fails. It circumvents the 12-month limit on the life of a credit where EPA admits that RINs had expired. 42 U.S.C. §7545(o)(5)(C). Any assertion that EPA is following this provision because the new RINs can only be used for compliance in the year generated or the next year confirms that EPA has given the credit two more years of life, regardless of any life the credit may have had left at the time they were retired. In other words, EPA is extending the statutory 12-month-limit by treating these RINs like "new" credits that can be used years after any biofuel was produced. EPA has previously found the statute prohibits such circumvention. 72 Fed. Reg. at 23,934 (JA672).

In addition, the statute outlines when small refineries can generate RINs; that is, when they *waive* the exemption. 42 U.S.C. §7545(o)(5)(A)(iii), (o)(9)(C). "This precludes EPA's inherent authority claim for 'EPA may not construe [a] statute in a way that completely nullifies textually applicable provisions meant to limit its

_____

[28]    RINs are "separated" upon blending, not generated. EPA's record does not indicate how the retired-RINs were obtained.
[29]    EPA's record does not identify the type of RINs generated (*e.g.*, biomass-based diesel generates D4 RINs).

27

discretion.'" *N.J. v. EPA*, 517 F.3d 574, 583 (D.C. Cir. 2008) (quoting *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 485 (2001)). EPA cannot create new authority to allow generation of RINs when the small refinery seeks and obtains an exemption. *See Sierra Club v. EPA*, 705 F.3d 458, 469 (D.C. Cir. 2013) ("Because the statute leaves no room for exemptions, such as those at issue, granting the permitting authorities discretion to apply the exemption is beyond the EPA's statutory authority."); *see also Ams. for Clean Energy*, 864 F.3d at 710 (finding EPA had no authority to base waiver on demand when statute referenced supply). EPA previously recognized this constraint on its authority, limiting when an exempt small refinery can "separate" RINs. 40 C.F.R. §80.1429(b)(8). Tellingly, EPA does not rely on the credit provisions to support its claimed authority.

EPA may seek to distinguish this case contending the original petitions were "timely" and the subsequent grant came after a judicial challenge. But Petitioner disputes that they were timely, as they did not seek prospective relief (*e.g.,* before the refineries' prior extension ended). The intervening challenge only allowed EPA's claimed authority to "un-retire" RINs to come to light.

EPA will likely claim the regulation, like the statute, allows petitions "at any time." But the statute must be read as a whole. It is unclear how such a broad reading of the phrase "at any time" ensures EPA can properly account for small refinery exemptions in setting the standards. 75 Fed. Reg. at 14,716 (JA685). While the

28

volumes *may* be reached if other refiners' transportation fuel exceed estimates, failure to account for the exempted volumes does not make certain the minimum volumes will be met. Also allowing RINs to be used again later does not reflect biofuel production in those later years, ensuring the *volumes* for those years will *not* be met. It makes little sense that Congress would have granted such broad authority to EPA to revise the statutory volumes when it imposed constraints on that authority to support *biofuel production*—and especially through such oblique language. *Whitman*, 531 U.S. at 468 (Congress "does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions-it does not, one might say, hide elephants in mouseholes.").

The statute seeks to incentivize those that further the volume mandates, not seek to avoid it. While the record provides no explanation for why relief was not sought earlier,[30] the statute does not leave small refineries without remedy. Since the statute only allows "extensions" of an exemption, a small refinery should not have had any obligation while it sought a longer exemption. *See also* 40 C.F.R. §80.1441(e)(2)(iii). Even if EPA delays or denies the request, the refinery could

---

[30]    Refineries can profit from waiting to seek an exemption. EPA has found that obligated parties regain the cost of RINs through fuel sales. Also, RIN prices could be higher later, allowing "profit" from their sale.

claim a deficit, and need not retire RINs,[31] while it awaits EPA's decision or appeals. 42 U.S.C. §7545(o)(5)(D). This makes sense if, in fact, the small refinery was suffering a *hardship* from having to comply with the RFS volume requirements. The statute's requirement that EPA respond to petitions within 90 days supports the public's calls for §80.1441 to provide more specifics and deadlines to facilitate timely responses. Even if EPA delayed, the remedy cannot violate other parts of the statute. *See Sierra Club v. EPA*, 762 F.3d 971, 981 (9th Cir. 2014) (rejecting claim that delay allowed EPA to "revise clear statutory terms") (citation omitted).

### C.    Even if There Was a Gap in the Statute, Allowing Small Refinery RINs is Arbitrary.

EPA's allowing Small Refinery RINs is arbitrary and capricious, because such allowance violates EPA's own regulations and because EPA failed to consider important aspects of the problem.

"It is 'axiomatic … that an agency is bound by its own regulations." *Nat'l Envtl. Dev. Ass'n's Clean Air Project*, 752 F.3d at 1009 (citations omitted). Under the RFS regulations, "[n]o person shall cause another person to commit an act in

---

[31]    Even if RINs somehow needed to be retired, a comparable "value" would be to offset the refinery's future obligations, not "un-retire" RINs. (EPA would still need to make up any shortfall.) In other words, there were other remedies available, which the public would surely have pointed out.

violation of any prohibited act under [the RFS]." 40 C.F.R. §80.1460(e). Here, EPA has authorized prohibited acts.

Prohibited acts include generating a RIN "for which the applicable renewable fuel volume was not produced" or "a RIN for fuel for which RINs have previously been generated." 40 C.F.R. §80.1460(b). Here RINs were generated based on "un-retiring" of RINs, not based on production. Even if EPA claims there was biofuel production initially (though not by the small refinery generating the RIN), then the RIN is for fuel for which RINs were previously generated.

Creating or transferring "a RIN that is invalid under §80.1431" is also prohibited. 40 C.F.R. §80.1460(b)(2). The Small Refinery RINs are invalid on several grounds. First, these RINs replace RINs previously submitted for compliance and, thus, are invalid as a "duplicate" of a previously generated RIN. *See Id*. §80.1431(a)(1)(i). Referring to "un-retiring" RINs is just semantics. EPA has previously recognized as much, creating exceptions for when it can reinstate RINs. *Id.* §§80.1427(a)(4)(iv), 80.1429(g). Second, when RINs expire, they become invalid for compliance purposes. *Id*. §§80.1428(c), 80.1431(a)(1)(iii). EPA cannot circumvent this prohibition by treating them as "new," extending their life. Third, Small Refinery RINs do not reflect biofuel produced by the small refinery. As such, the RINs cannot represent renewable fuel as defined in §80.1401, and they cannot accurately reflect the proper temperature adjustment for the volume produced, a

proper equivalence value, or the correct "D" code for the associated volume of fuel. *Id.* §80.1431(a)(1)(ii), (iv), (vi) and (vii). Finally, because there is no regulation authorizing generation of RINs in this context, they were "otherwise improperly generated." *Id*. §80.1431(a)(1)(ix). Thus, EPA has violated its own regulations in allowing generation and use of these invalid RINs.

Moreover, the public has repeatedly asked EPA to fulfill its obligations to ensure the volumes to provide certainty and transparency. EPA's failure to consider the implications of these RINs re-entering the market renders EPA's decision arbitrary. EPA cannot ignore a significant aspect of a problem and claim reasoned decision-making. And, EPA must ground its reasons in the statute. *Nat. Res. Def. Council v. EPA*, 777 F.3d 456, 468-69 (D.C. Cir. 2014) (citation omitted). Concerns have been raised regarding EPA overstepping its authority, but EPA did not discuss the statutory or regulatory limitations on that authority.

There is simply no record evidence that EPA considered any other potential remedies to avoid market impacts. This is despite prior comments submitted to EPA that provided alternatives, which EPA failed to address. 77 Fed. Reg. at 1340 (JA719). In failing to fully explain EPA's rationale and ignoring these concerns, EPA also failed to adequately respond to comments.

### D.     The D.C. Circuit is the Appropriate Venue Here.

The Clean Air Act seeks uniformity in decisions related to nationally applicable regulations, placing exclusive review in the D.C. Circuit. The minimum applicable volumes under the RFS program are *national* requirements. Indeed, EPA is prohibited from imposing geographic restrictions where renewable fuel can be used. 42 U.S.C. §7545(o)(2)(A)(iii)(II)(aa). *Nationally applicable* regulations dictate how and when RINs can be generated and used for compliance with the *national* RFS program.[32] The D.C. Circuit is the appropriate venue to hear Petitioner's claims.

There can be no dispute that there is final agency action. EPA has conceded its decision has legal effect, and there is no further deliberation. *See Nat'l Envtl. Dev. Ass'n's Clean Air Project*, 752 F.3d at 1007 (finding directive regarding applicability of Sixth Circuit decision was final agency action). Instead, EPA contends the action is of local applicability only reviewable in the Tenth Circuit because it packaged this determination in adjudications related to three Wyoming refineries. While ostensibly applicable to these refineries, this determination amends EPA's *national* regulations and extends well beyond the confines of Wyoming. The

---

[32]     RINs are the measure of compliance with the RFS program. 42 U.S.C. §7607(b)(1) lists challenges to "any control or prohibition" under §7545 among those to be filed "only" in the D.C. Circuit.

Appellate Case: 19-9532    Document: 37-1    Date Filed: 06/27/2019    Page: 55

mere location of the refineries at issue, thus, is not dispositive for purposes of determining venue here. *See Nat. Res. Def. Council v. Thomas*, 838 F.2d 1224, 1249 (D.C. Cir. 1988) ("Whatever the distribution of affected plants, however, we think the clearly nationwide scope of the regulation is controlling.").

In this adjudication, EPA is not merely applying regulations to a particular case. Rather, EPA is creating a new means for generation of RINs that can be bought and used by RFS-registered parties throughout the country to meet *national* requirements. The Seventh Circuit has found that challenges to specific allowances granted as part of a national program were not locally applicable for purposes of venue under the Clean Air Act. *S. Ill. Power Coop. v. EPA*, 863 F.3d 666, 674 (7th Cir. 2017).[33]

It is simply untrue to contend that the decisions only have legal effect on three Wyoming refineries. There is no indication in the record that EPA placed any limitations on who can hold those RINs and how those RINs could be used. As such, they are not only available for use by those refineries or even by obligated parties

---

[33]    In *S. Ill. Power Coop.*, 863 F.3d at 671, 674, the Seventh Circuit overruled *Madison Gas & Elec. Co. v. EPA*, 4 F.3d 529 (7th Cir. 1993), that had found a challenge to allowances granted to a particular facility that were an "element of a national program" was locally applicable. It did so, because the decision affected others subject to the national program. Similarly, the RINs EPA allowed here are an "element of a national program," directly affecting the national RFS volumes and legal rights of other parties.

only located in Wyoming. They can be bought and used by third parties outside the Tenth Circuit in the national RIN-market. That these RINs revived previously expired RINs also opens the original RIN-generators to renewed potential liability if they are subsequently found invalid.

It also would make little sense to require a petitioner to challenge each time EPA makes such determination with respect to a refinery in a different Circuit, risking inconsistent determinations as to whether the RINs EPA allowed were valid. For example, let's say that EPA made a similar determination in its review of the denied exemption the Fourth Circuit recently remanded to EPA related to a refinery in West Virginia. If Petitioner could even identify when and for what facilities EPA made such determination in its secret adjudications and challenged them in the regional circuit, EPA's position would create chaos in a nationwide trading program if the Tenth Circuit found EPA had authority while the Fourth Circuit did not. In one case the RINs would be valid, and invalid in the other. In the meantime, those RINs may have passed through several hands throughout the country, and the national volume requirements would be impacted.

The fact that the specific refineries that received the related exemptions are located in Wyoming is mere happenstance. "The D.C. Circuit has explained that these venue provisions are intended 'to place nationally significant decisions in the D.C. Circuit,' while localized controversies remain in the affected regions." *Sierra*

*Club v. Johnson*, 623 F. Supp. 2d 31, 36 (D.D.C. 2009) (citation omitted). Allowing RINs that can be used in a national trading and compliance program differs significantly from, for example, a permit applicable to a particular facility that discharges water into a local waterway where local interest supports having the case heard locally.[34] In other words, simply because EPA only identified narrow circumstances when it applied this authority does not render the action locally applicable.[35] *See ATK Launch Sys., Inc. v. EPA*, 651 F.3d 1194, 1197 (10th Cir. 2011) (transferring case to D.C. Circuit where EPA "also applies a uniform process and standard across the country").

Moreover, EPA simply presumes venue was originally appropriate in the Tenth Circuit. But EPA conceded venue in *Sinclair Oil*[36] and *voluntarily* sought remand with respect to related cases also filed in the Tenth Circuit. These are questionable bases to divest this Court of venue, particularly when EPA, on its own accord, chose to expand its decision on remand from the Tenth Circuit. Had EPA

---

[34]   Indeed, EPA did not include any documents regarding the facilities' operations as part of the record. [Doc. #1770215].

[35]   Petitioner believes EPA applies similar treatment more broadly, but EPA keeps this information under lock-and-key.

[36]   EPA previously has not disputed venue in this Circuit. *Hermes Consol., LLC*, 787 F.3d 568. EPA should not be allowed to forum shop by picking-and-choosing when to challenge venue, particularly when using secret informal adjudications.

properly followed its rulemaking obligations rather than impermissibly use informal adjudications, EPA cannot dispute venue would appropriately be in the D.C. Circuit.

Even if this Court finds some merit to EPA's claims, the substantial questions as to the validity of EPA's decisions do not support dismissal. Although Petitioner believes the D.C. Circuit is the appropriate venue to hear its claims, fairness, the interests of justice, and judicial economy dictate transfer over dismissal. This is so Petitioner need not start from scratch and move the case along in the Tenth Circuit.

## III.    EPA'S DETERMINATION TO ALLOW RETROACTIVE GRANTS OF EXEMPTIONS AND EPA'S FAILURE TO ACCOUNT FOR LOST VOLUMES AS A RESULT ARE AGAINST THE LAW AND ARBITRARY.

In 2010, EPA promulgated 40 C.F.R. §80.1441, which was amended in 2014, outlining the process for submitting petitions for seeking an extension of the temporary exemption for small refineries. In preamble language, EPA also indicated that it could grant small refinery exemptions under §80.1441 after the standards were set and not adjust the standards to account for those exemptions. EPA repeated this determination on several occasions, including when it set the standards for 2012, which was the year before petitions seeking such extensions became relevant, and when it set the 2018 standards.[37] Because EPA withheld crucial information

---

[37]    Prior to 2013, the exemptions were based on a DOE study rather than addressing case-by-case petitions. 75 Fed. Reg. at 76,805 (JA709). While EPA may dispute that Petitioner should have cited the Federal Register notice for the 2012 standards in its Petition for Review, the Petition clearly identified the final agency

regarding its implementation of the small refinery exemptions and assured the public that the impact of these exemptions were minimal, the public, while raising concerns, had no grounds to challenge them at the time the regulation was promulgated and these statements were made. Because the RFS volumes were being exceeded and EPA implemented the small refinery exemptions through non-public adjudications, the public remained unaware of the scope and impacts of EPA's actions until 2018.

In June and July of 2018, it became clear that EPA believed its authority to grant exemptions was well-beyond what it vaguely referenced to the public, including granting petitions submitted after the refinery's extension lapsed. To make matters worse, it also became clear that EPA was allowing small refineries to come into compliance with the RFS, but, nonetheless, still obtain an exemption, resulting in previously retired—and even expired—RINs to reenter the market with significant adverse effects. EPA also released data showing these exempted volumes were more than minimal amounts and were causing the RFS volumes not to be met. This raised new grounds for seeking judicial review and gave new meaning to the concerns previously raised by the public and reasserted in numerous letters to EPA.

---

action being challenged, and the same finding was made in other Federal Register notices cited. *See* 82 Fed. Reg. at 58,523 (JA805). As such, EPA's determination that it is authorized to grant exemptions retroactively is properly before this Court.

EPA nonetheless reaffirmed it believes it has authority to grant such untimely exemptions in a July 12, 2018 letter to Senator Grassley, which was cited in the Petition for Review. These new grounds show EPA's regulations do not "ensure" the minimum applicable volumes are being met as required, and EPA has exceeded its authority. *See* 42 U.S.C. §§7545(o)(2)(A)(i), (o)(3)(B)(i).

### A.    This Court has Jurisdiction to Hear Petitioner's Grounds Arising After Claims.

While the Clean Air Act includes a requirement that challenges seeking judicial review of final agency action be brought within 60 days of promulgation, 42 U.S.C. §7607(b), Congress did not intend to permanently immunize all regulations from review. Instead, Congress "struck a careful balance between the need for administrative finality and the need to provide for subsequent review in the event of unexpected difficulties." *Nat'l Mining Ass'n v. Dept. of Interior*, 70 F.3d 1345, 1350 (D.C. Cir. 1995). To ensure that balance, Clean Air Act regulations may be reviewed whenever claims become ripe, new grounds for review arise, or whenever EPA changes the stakes for judicial review.

EPA's broad expansions of its authority through secret adjudications represent "subsequent factual [and] legal development[s]" raising new grounds for seeking judicial review. *Sierra Club de P.R. v. EPA*, 815 F.3d 22, 27-28 (D.C. Cir. 2016). None of these are developments the public could have divined, and they substantially altered the stakes for seeking judicial review.

**1. EPA's expansion of its authority through secret adjudications are new and unexpected modifications to EPA regulations.**

Challenges to Clean Air Act regulations may be based on "grounds arising after" the 60-day review period. 42 U.S.C. §7607(b)(1). EPA's actions here provide such grounds because they dramatically depart from how Petitioner and the public understood how §80.1441 would be implemented. These are new grounds that "essentially create a challenge" to regulation "that did not previously exist." *Eagle-Picher Indus. Inc. v. EPA*, 759 F.2d 905, 913 (D.C. Cir. 1985).

EPA's determinations that it could grant exemptions even when a small refinery can comply or came into compliance with the RFS and that it would revive any retired, including expired, RINs was not part of its rulemaking proceedings for 40 C.F.R. §80.1441; nor was it mentioned when EPA indicated it *may* grant small refinery exemptions after the standards are set. "[I]t was the business of the EPA, and not the public, to foresee that possibility and to address it in its proposed regulations." *Shell Oil Co. v. EPA*, 950 F.2d 741, 751 (D.C. Cir. 1992). Vague references by EPA are insufficient to put the public on notice of EPA's secret determinations. *See Am. Med. Ass'n v. Reno*, 57 F.3d 1129, 1132 (D.C. Cir. 1995) (noting notice-and-comment requirements, "which serve important purposes of agency accountability and reasoned decision-making, impose a significant duty on the agency").

As such, Petitioner cannot be faulted for not predicting them. Petitioner's challenge is analogous to that in *Coalition for Responsible Regulation, Inc. v. EPA*, where the petitioners sought review of EPA's interpretations of Clean Air Act permitting triggers based on unforeseen subsequent decision to regulate greenhouse gases. 684 F.3d 102, 131 (D.C. Cir. 2012), *aff'd in part, rev'd in part sub nom. Util. Air Regulatory Grp. v. EPA*, 134 S. Ct. 2427 (2014). This Court held that the "grounds arising after" challenge in *Coalition for Responsible Regulation* was timely, in part because EPA's rule regulating greenhouse gases "had the effect of expanding the PSD program to never-regulated sources." *Id.* at 130. Here EPA expanded RIN generation beyond what's allowed in the statute and to parties that never before could do so under the regulations.[38] Because this information solidified EPA's actions in July of 2018, Petitioner timely filed its Petition within sixty days from when these grounds arose.

### 2.     Petitioner's claims only now ripened.

Not only did Petitioner previously lack the information necessary to bring its challenge before now, it *could not* have done so because it would not have been ripe for review. Claims are not ripe for judicial review when there is no concrete and

---

[38]     While that case involved a challenge by the previously unregulated source, that was the party affected by the expansion of the regulation. Here biofuels producers are the ones adversely affected by the expansion of EPA's authority.

USCA Case #18-1202    Document #1780383    Filed: 04/01/2019    Page 63 of 79

imminent injury. *Reno v. Catholic Social Servs. Inc.*, 509 U.S. 43, 57–58 (1993).

Not every claim ripens when a regulation is promulgated because not every injury is

concrete and imminent at the time. *See La. Envtl. Action Network v. Browner*, 87

F.3d 1379, 1385 (D.C. Cir. 1996) (declining to review EPA Clean Air Act

regulations because of "the classic institutional reason to postpone review: [it]

need[s] to wait for 'a rule to be applied [to see] what its effect will be'") (citation

and internal quotations omitted); *Diamond Shamrock Corp. v. Costle*, 580 F.2d 670,

672 (D.C. Cir. 1978) (declining to review EPA regulations that had "not been felt in

a concrete way by the appellants") (citation omitted); *see also Toilet Goods Ass'n,

Inc. v. Gardner*, 387 U.S. 158, 164 (1967) (finding matter unripe because judicial

review would be "on a much surer footing in the context of a specific application");

*Ass'n of Am. Railroads v. I.C.C.*, 846 F.2d 1465, 1469 (D.C. Cir. 1988) (matters may

be unripe when "review would significantly benefit from waiting for the issue to

arise in a more concrete form") (citations omitted). If challenged earlier, the Court

would have spent significant "'resources on what amounts to shadow boxing.'"

*Devia v. Nuclear Regulatory Comm'n*, 492 F.3d 421, 424–25 (D.C. Cir. 2007)

(quoting *McInnis–Misenor v. Me. Med. Ctr.*, 319 F.3d 63, 72 (1st Cir. 2003)).

Indeed, EPA only indicated it *may* grant exemptions under §80.1441 after the

standards are set in preamble language. Such language is not "final." *See Nat. Res.

Def. Council v. EPA*, 559 F.3d 561, 564-65 (D.C. Cir. 2009) (preamble language not

final until action consummated). And the harms to the biofuels industry were not crystallized until now when it has been placed into a "concrete setting." *Gen. Elec. v. EPA*, 290 F.3d 377, 380 (D.C. Cir. 2002); *see also Nuclear Energy Inst. Inc. v. EPA*, 373 F.3d 1251, 1313 (D.C. Cir. 2004) (noting judicial review can benefit from postponing review "until the agency's policy has 'crystallized' through implementation in a concrete factual setting") (citation omitted). Unlike in *Nat'l Biodiesel Board v. EPA*, 843 F.3d 1010 (D.C. Cir. 2016), where this Court found that the biodiesel industry should have been aware that other countries would seek to utilize an alternative compliance approach consistent with the regulations, the biofuels industry could not have been aware that EPA would allow such actions when the statute and other regulations expressly prohibited them.

Indeed, EPA indicated that the volume requirements would be met or that the exemptions had minimal, if any, impact on the volume requirements. EPA should not be allowed to goad the public into believing all is well and then, behind closed doors, substantially change the regulatory scheme without judicial oversight. Importantly, it is unclear how Petitioner could have challenged the impact of "un-retiring" RINs when EPA previously provided no indication it would do so. In other words, the harms to the biofuels industry were speculative and unknown until EPA expanded its application of the regulations (and the public became aware of it).

### 3.    EPA reopened prior determinations.

"[J]udicial review of a long-standing regulation is not barred when an agency reopens" it. *Kennecott Utah Copper Corp. v. Dep't of Interior*, 88 F.3d 1191, 1213 (D.C. Cir. 1996). EPA's changes to how the small refinery exemptions operate through informal adjudications reopened the time for seeking review here. *See Ohio v. EPA*, 838 F.2d 1325, 1328 (D.C. Cir. 1988) ("[T]he period for seeking judicial review may be made to run anew when the agency in question by some new promulgation creates the opportunity for renewed comment and objection."). EPA impermissibly made these determinations through informal adjudications when regulations were required by statute. *See Croplife v. EPA*, 329 F.3d 876, 884 (D.C. Cir. 2003) (finding reopening in directive announced in Press Release). In expanding its authority to allow revived or unretired RINs, EPA adhered to its determination that it can grant retroactive exemptions and do so without revising the volume obligations. Considering the "entire context" of EPA's actions, this constitutes reopening of the issues challenged here. *CTIA-The Wireless Ass'n v. FCC*, 466 F.3d 105, 111 (D.C. Cir. 2006) (citation omitted).

This Court also has recognized "constructive" reopening of regulations when an agency action significantly alters the stakes for seeking judicial review. *Sierra Club v. EPA*, 551 F.3d 1019, 1025-26 (D.C. Cir. 2008). The significant expansion of the program clearly changed the stakes for seeking judicial review.

Both the statute and the regulations refer to "extensions" of exemptions. After the initial temporary exemption for all small refineries, DOE found 13 of 59 small refineries were entitled to extensions of the exemption for two more years. *Sinclair Wyo. Refining*, 887 F.3d at 990. From 2013-2015, EPA granted 7 or 8 exemptions total.[39] It was not until June/July 2018 that EPA explained it substantially expanded that number to 19 in 2016 and 29 in 2017, with more pending, and that many of them were likely sought well into and even after *the compliance year ended*, raising concerns that a significant number of RINs are re-entering the market.[40] These are clearly no longer "extensions" of existing exemptions where the small refinery could have availed itself of the deficit carryover if EPA had not responded in time, but include new exemptions being granted by EPA where any prior exemption lapsed.

This is significant because any retroactive small refinery exemptions, even if impermissible, previously had minimal (or no) impact on meeting the volume requirements prior to 2016, and EPA attributed "imprecision" in the volumes to using projections for gasoline and diesel fuel use.[41] EPA would surely have

_____

[39]    EPA, *Small Refinery Exemptions*, https://www.epa.gov/fuels-registration-reporting-and-compliance-help/rfs-small-refinery-exemptions (last updated Dec. 18, 2018).

[40]    Although there were earlier reports of an increased number of exemptions, these did not indicate when those were given or that RINs were "un-retired."

[41]    This Court has allowed obligated parties to challenge EPA's methodology for setting cellulosic biofuel standards that EPA had previously articulated, finding the "reasonableness of adopting a predictive methodology is not the same as the

Appellate Case: 19-9532    Document: 37-1    Date Filed: 06/27/2019    Page: 67

questioned if the industry's harms were speculative for purposes of standing.[42] While

EPA may attempt to portray its actions as isolated, the potential gravity and scope

of EPA's actions were unknown to the public until EPA identified the number of

exemptions in the July 12, 2018 letter to Senator Grassley (JA836). For compliance

year 2017, however, the waived RFS volume reached almost 1.5 billion gallons.[43]

This is not minimal or "imprecision." This affects the volume mandates and

substantially expands the bank of RINs that could be used in later years, which now

appears were as a result of "un-retiring" RINs rather than biofuel production.[44] This

significantly altered biofuel producers' "financial incentives for challenging the

regulation." *Sierra Club*, 551 F.3d at 1026 (citing *Kennecott*, 88 F.3d at 1227); *see*

*also Nat'l Ass'n of Mfrs. v. U.S. Dep't of Interior*, 134 F.3d 1095, 1104-05 (D.C.

---

reasonableness of *maintaining* one in the face of experience; considering whether to maintain a methodology necessarily invites reflection on the success of earlier applications." *Am. Petroleum Inst. v. EPA*, 706 F.3d 474, 477 (D.C. Cir. 2013). Similarly, the reasonableness of EPA maintaining its same determination to allow retroactive exemptions and not revise the standards must be reexamined based on new circumstances.

[42]    *See, e.g.,* EPA-HQ-OAR-2017-0091-3657 at 1-2 (contending "volumes exempted for small refineries after the publication of the final standards in any given year comprise a very small percentage of the volumes mandated in the final standards") (JA810-811); EPA Br. at 52-53, *Monroe Energy v. EPA*, No. 13-1265 (D.C. Cir. filed Feb. 4, 2014) [Doc #1478305] (arguing accounting for small refinery exemptions had *de minimis* impact on standards).

[43]    This represents more than 7.5% of the 19.28 billion gallons required in 2017.

[44]    83 Fed. Reg. at 32,029 (JA825). In the 2019 RFS, EPA stated comments on the small refinery exemption would be outside the scope of the proposal, as another attempt to evade judicial review. *Id.* at 32,057 (JA828).

Cir. 1998) (finding reopening where agency's revisions to regulatory procedures altered stakes for seeking review of predictive nature of models for calculation). In short, EPA's expansion of its authority gave EPA's prior claimed treatment of small refinery exemptions "new significance." *Sierra Club*, 551 F.3d at 1026 (citing *Kennecott*, 88 F.3d at 1227).

### 4. This Court may proceed to the merits without waiting for EPA action on Petitioner's petition for reconsideration.

Although Petitioner also sought to avail itself of available administrative remedies, EPA was aware of these objections through letters to EPA, which stated:

> We believe EPA has exceeded its authority under the CAA through the retroactive award of Renewable Identification Numbers (RINS) and by attempting to compensate companies by providing them RINs. Additionally, EPA appears to have further exceeded its authority by issuing RINs that do not represent the production of any actual gallons of biofuels.[45]

EPA nonetheless affirmed it believes it has such authority, and the Court need not, and the public should not have to, wait until EPA decides to issue a formal response to Petitioner's administrative petition.

The concerns regarding first ensuring informed decision-making raised in *Oljato Chapter of the Navajo Tribe v. Train*, 515 F.2d 654 (D.C. Cir. 1975), are not present here. The new information supporting judicial review is based on EPA's own

---

[45]    Ex. B to Opp'n to Mot. to Dismiss [Doc. #1764330] (JA831).

actions. In addition, members of Congress and the public have written to EPA, raising their concerns with its recent actions.[46] EPA rejected those concerns in responding to Senator Grassley on July 12, 2018.[47] Thus, EPA has reaffirmed the decisions challenged here. Requiring Petitioner to wait for EPA to formally respond to its petition only to have EPA affirm its findings again "would be pointless" and only continue the harms caused to annual requirements where EPA has no deadline to respond. *Kennecott*, 88 F.3d at 1214; *see also id.* ("Only if the agency in another rulemaking (or perhaps elsewhere) reiterates its previously adopted rule 'in such a way as to render [it] subject to renewed challenge on a[] substantive ground[],' …, is it unnecessary for the petitioner to return to 'Go.'") (citation omitted); *see also Randolph-Sheppard Vendors of Am. v. Weinberger*, 795 F.2d 90, 104-09 (D.C. Cir. 1986) (recognizing futility and delay as exceptions to statutory administrative exhaustion requirement). It is the public, not EPA, that was not aware of these new grounds.

In addition, there is no need for further development of the factual record before EPA to enable the Court to review its action. *Cf. Oljato*, 515 F.2d at 665-667. Petitioner raises questions of EPA's authority under the statute and compliance with

---

[46]    *See, supra* n.14. *See Am. Petroleum Inst. v. Costle*, 665 F.2d 1176, 1191 (D.C. Cir. 1981) (noting communication indicating objection is sufficient).
[47]    EPA did so again on August 7, 2018 in a letter to Rep. Loebsack. *See* Ex. E to Opp'n to Mot. to Dismiss [Doc. #1764330] (JA846-847).

its own regulations, which are legal questions. "And, in any event, statutory interpretation is the specialization of the courts, not the agencies." *Sinclair Wyo. Ref.*, 887 F.3d at 996 n.6 (citing *Frontier Airlines, Inc. v. Civil Aeronautics Bd.*, 621 F.2d 369, 371 (10th Cir. 1980) ("The general rule requiring exhaustion of remedies before an administrative agency is subject to an exception where the question is solely one of statutory interpretation.")). In addition, EPA continues to accept untimely requests related to 2016 and 2017 compliance years (and now 2018). Because of the futility in waiting for a formal response and the need for the market to understand the scope of EPA's authority, this Court should proceed to the merits of these claims.

### B. Retroactive Exemptions are Not Consistent with Law.

EPA's determination that it can grant small refinery exemptions after the standards are set is not consistent with law. The statute creates *prospective* mandates. 42 U.S.C. §7545(o)(2). The statute also only contemplates *prospective* exemptions where petitions are limited to "extensions," and DOE's study was to be prospective in nature. *Id.* §7545(o)(9). Congress sought to have these refineries enter the program, it just sought to give them some time before doing so. In other words, small refineries, like all other refineries, needed to move toward coming into compliance.

EPA's regulation also does not evidence authority to seek or grant "retroactive" relief. Like the statute, the regulations are *prospective* in nature. The

Appellate Case: 19-9532    Document: 37-1    Date Filed: 06/27/2019    Page: 71

refinery must meet the definition of small refinery before it seeks the exemption "and must be *projected* to meet the definition … for the year or years for which an exemption is sought." 40 C.F.R. §80.1441(e)(2)(iii) (emphasis added). In other words, nothing requires the small refinery to wait and see if its production exceeds the 75,000-barrels-per-day threshold in any particular year. More important, EPA's regulations require that the petitioning small refinery indicate "the date the refiner anticipates that compliance with the requirements *can reasonably be achieved*." *Id.* §80.1441(e)(2)(i) (emphasis added). It makes little sense to allow a small refinery to wait all year and even *to actually comply* to then argue it will suffer a disproportionate economic *hardship* if required to comply. EPA regulations also treat exempt small refineries differently from other obligated parties, which makes no sense if a small refinery can act like an obligated party all year, and then seek an exemption. 40 C.F.R. §80.1429(b)(8). In other words, EPA has allowed refineries to pick and choose when and for what years they seek an exemption, regardless of whether they can comply with the RFS (and regardless of whether the volumes are being met), which is contrary to the law.[48]

---

[48]    Although EPA indicated it was reducing the statutory volumes and was late in issuing standards for 2014 and 2015, nothing prevented a small refinery from seeking prospective relief for those years and challenging any delay or denial by EPA on such grounds.

Appellate Case: 19-9532    Document: 27-1    Date Filed: 06/27/2019    Page: 72

## C.    If §80.1441 Allows for Retroactive Exemptions, it is Arbitrary.

EPA may assert that 40 C.F.R. §80.1441 allows requests for an extension "at any time," mirroring language in the statute. Reading this phrase to allow retroactive exemptions leads to absurd results and, thus, is arbitrary.

The phrase "at any time" in 42 U.S.C. §7545(o)(9), and 40 C.F.R. §80.1441, simply means the request can be made during the temporary extension period or after it ended. This makes sense because these exemptions may be extended more than once. Indeed, refiners read this phrase to indicate the exemption was not "temporary."[49] Forgetting Congress incentivized *all* refineries to participate, this does not mean the petition can be submitted during or after the compliance year.

At most, it is ambiguous what time frame Congress sought to address, but, in no case, is it clear that Congress meant petitions can be submitted or granted before, during or after the compliance year. "Any" "can and does mean different things depending upon the setting." *Nixon v. Mo. Municipal League*, 541 U.S. 125, 132 (2004) (citations omitted). In allowing petitions after the exemption lapsed and granting exemptions well after, including after the small refinery complies with the requirements, EPA has broadly expanded "at any time" to have no bounds. *See Air All. Houston*, 906 F.3d at 1066 ("EPA's interpretation of its delay authority is not

---

[49]    EPA-HQ-OAR-2015-0111-2339 at 17 (JA753).

Appellate Case: 19-9532    Document: 37-1    Date Filed: 06/27/2019    Page: 73

reasonable because it has no stopping point."). For example, it would be absurd to allow a small refinery, in 2019, to request an exemption for 2013 (and regain its retired RINs), although that's what such a reading would allow. Thus, there must be some parameters on the phrase.

The Court should look to the statute and Congress's purposes in determining whether EPA's refusal to place parameters on when a petition can be submitted or granted is a permissible reading. The statute requires minimum applicable volumes of renewable fuel each year, and EPA's regulations and compliance mechanisms must "ensure" the required volumes are met. 42 U.S.C. §7545(o)(2)(A), (o)(3). Given the purpose of the RFS program to promote production of renewable fuels to displace fossil fuel use, the phrase "at any time" with respect to a "temporary exemption" for small refineries cannot be viewed in isolation. Indeed, EPA has recognized, there are ways to handle requests for exemptions that would not result in improper reductions of the volumes.[50] Instead of doing so, EPA claims it is allowed some "imprecision" in the volumes. But EPA has intentionally reduced the required volumes in an apparent attempt to lower RIN prices (it worked) and to

---

[50]    *See* EPA-HQ-OAR-2010-0133-0159 at 8-10 (JA726-728); EPA-HQ-OAR-2017-0091-3953 at 6-7 (JA814-815); *see also* EPA-HQ-OAR-2017-0091-4990 at 216 (JA818).

benefit small refineries to the detriment of biofuels producers—the intended beneficiaries of the program.

By granting retroactive exemptions and also allowing RINs to be generated without representing actual production, EPA is effectively further reducing the statutory *volumes* (*i.e.,* gallon requirements) for 2016, 2017 and 2018 (and even later years). EPA did so knowing that the standards did not account for these exemptions. And, EPA is knowingly increasing the number of prior-year RINs that can be used, rather than ensure actual gallons in 2018 and later. But the Clean Air Act constrains EPA's authority to reduce the volume requirements—it may exercise one of its statutorily specified waiver powers, but only if the statutorily preconditions are met.[51] 42 U.S.C. §7545(o)(7). "EPA cannot escape Congress's clear intent to specifically limit the agency's authority…." *Air All. Houston*, 906 F.3d at 1061.

Specifically, EPA can reduce the statutorily mandated volume requirements only if, after following required procedures, EPA finds that the requirements would "severely harm the economy or environment of a State, a region, or the United States" or that "there is an inadequate domestic supply." 42 U.S.C. §7545(o)(7)(A).[52] EPA has not followed these procedural requirements, and granting a small refinery

---

[51]    In *Americans for Clean Energy*, this Court already found, for 2016, EPA impermissibly expanded its waiver authority. 864 F.3d at 710.

[52]    The statute includes specific waiver provisions for cellulosic biofuel and biomass-based diesel, which are not applicable here. 42 U.S.C. §7545(o)(7)(D-E).

exemption does not meet the substantive criteria; that is, it does not equate to severe economic harm under the statute.[53] Moreover, the 2018 volumes (and later) are affected by the influx of prior-year RINs that can be used to demonstrate compliance. But, the grant of a small refinery exemption for 2017, or earlier, cannot justify a waiver *in 2018 (or later)*.

Further, EPA itself has raised concerns regarding potential RIN market manipulation.[54] Retroactive exemptions allow small refineries to buy and hold RINs without taking any actions to promote biofuels and even circumvent other limitations on RIN use. For example, "retroactive" exemptions allow a small refinery to take advantage of being an obligated party, which allows it to separate RINs upon ownership of biofuels without requiring it to use or blend that biofuel, rather than to require it to blend or use that biofuel if it was subject to the exemption. *See, e.g.,* EPA-HQ-OAR-2005-0161-0203 at 5 (JA680). This allows a small refinery to wait-and-see how RIN markets are operating and to hold and dump RINs when advantageous. These actions, however, adversely affect RIN-market operations and the RFS program.

As the public previously noted, there is an easy fix. EPA could actually require an extension be sought *prospectively*; that is, before the existing one expires (*i.e.*,

---

[53]    *See, e.g.,* EPA-HQ-OAR-2017-0091-4990 at 24 (JA817).
[54]    83 Fed. Reg. at 32,027 (JA824).

prior to the compliance year covered by the requested extension). EPA can then account for the exemptions when it sets the standards, resolving these issues before the compliance obligations apply and allowing refineries to utilize the deficit carryover, even if EPA is late. EPA's current process is arbitrary.

### D. EPA Must Reassess the 2016, 2017 and 2018 Standards Because it has Not Ensured the Required Volumes.

In setting the 2016, 2017 and 2018 standards, EPA did not adjust the volume requirements to account for the new small refinery exemptions or for RINs reentering the market as a result. As discussed above, the retroactive grant of exemptions violates the law and allowing the generation of Small Refinery RINs is impermissible. Again, the public provided an easy fix to EPA—add the lost volumes to subsequent years, as EPA has previously done to ensure missed volumes. *Nat'l Petrochemical & Refiners Ass'n*, 630 F.3d at 158. EPA has, to date, refused to do so. EPA cannot have it both ways. Thus, the Court should also require EPA to revisit (but not vacate) the standards for 2016, 2017 and 2018 to ensure that those volumes have been met.

### CONCLUSION

This Court "typically vacates rules when an agency 'entirely fail[s]' to provide notice and comment." *Daimler Trucks N. Am.*, 737 F.3d at 103 (quoting *Shell Oil Co. v. EPA*, 950 F.2d 741, 752 (D.C. Cir. 1991)); *see also Sierra Club v. EPA*, 699 F.3d 530, 535 (D.C. Cir. 2012) (vacating and remanding determination made

without required notice and comment). EPA's determination allowing retroactive

exemptions and Small Refinery RINs should be vacated and remanded to the agency.

To the extent necessary, 40 C.F.R. §80.1441 and the 2016, 2017 and 2018 standards

also should be remanded (but not vacated) for further consideration by EPA.

Dated April 1, 2019                    Respectfully submitted,


       /s/ Jerome C. Muys, Jr.
Jerome C. Muys, Jr.
Muys & Associates, LLC
910 17th Street, NW
Suite 800
Washington, DC 20006
T 202 559-2054
F 202 559-2052
jmuys@muyslaw.com

Sandra P. Franco
Franco Environmental Law LLC
600 Pennsylvania Ave., SE
Unit 15577
Washington, DC 20003

*Counsel for Producers of Renewables United*
*for Integrity Truth and Transparency*

**CERTIFICATION PURSUANT TO FRAP 32(a)(7)**

Pursuant to Federal Rule of Appellate Procedure 32(a)(7), the undersigned hereby certifies that the foregoing Final Opening Brief of Petitioner is 12,995 words in compliance with the word limit of 13,000 words in Rule 32(a)(7)(B)(i).

Dated April 1, 2019                    Respectfully submitted,


      /s/ Jerome C. Muys, Jr.
      Jerome C. Muys, Jr.

## CERTIFICATE OF SERVICE

I hereby certify that on this 1st day of April, 2019, I caused to be electronically filed the foregoing Final Opening Brief of Petitioner with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit by using the Court's CM/ECF system, which will serve counsel of record.

/s/ Jerome C. Muys, Jr.

Jerome C. Muys, Jr.